No. 69,334

ORRIN J. FOWLES, *Plaintiff/Appellant*, v. THE STATE OF KANSAS; THE KANSAS STATE LOTTERY, A State Agency; RALPH DECKER, Executive Director of Lottery Commission, Kansas; and THE KANSAS STATE LOTTERY COMMISSION, consisting of C.W. KLEIN; RAY E. MORGAN; PATRICIA ROSE; DUANE E. NIGHTENGALE; and PAUL M. STEELE, Lottery Commission Members, *Defendants/Third-Party Plaintiffs/Appellees*, v. LEISZLER OIL CO., INC., *Third-Party Defendant/Third-Party Plaintiff*, v. PENNIE CRANMER, *Third-Party Defendant*.

(867 P.2d 357)

Opinion filed January 21, 1994.

*Stephen P. Weir*, of Hein, Ebert and Weir, Chtd., of Topeka, argued the cause and was on the briefs for the appellant.

*John W. Campbell*, deputy attorney general, argued the cause, and *Robert T. Stephan*, attorney general, was with him on the brief for appellees.

The opinion of the court was delivered by

ABBOTT, J.: Plaintiff Orrin J. Fowles alleges he purchased the winning ticket in the July 20, 1988, Kansas Cash Lotto drawing. Kansas Lottery refused to pay Fowles the prize of $117,037.00 because he failed to produce the winning ticket. Fowles brought suit against numerous Lottery defendants. The trial court granted defendants' motion for summary judgment, and plaintiff appealed. The appeal was transferred to this court pursuant to K.S.A. 20-3018(c).

Orrin J. Fowles alleges that on July 17, 1988, at approximately 1:35 p.m. he purchased a Kansas Cash Lotto ticket for $1 from Pennie Cranmer, an employee of the Short Stop Convenience Store, which is an authorized Kansas Lottery retailer in Clay

Center. Ms. Cranmer is also plaintiff's daughter. Plaintiff asked Pennie Cranmer to hold the ticket for him and check the winning numbers for the next drawing (July 20, 1988) because he was going to be out of town. Ms. Cranmer agreed. Ms. Cranmer wrote plaintiff's name on the front of the ticket and placed it in a basket under the counter at the convenience store. Both plaintiff and Ms. Cranmer have signed sworn affidavits concerning these events.

On July 18, 1988, Ms. Cranmer remembered the ticket she had agreed to hold for her father and realized the ticket was not in her purse. On July 19, 1988, Ms. Cranmer's husband went to the Short Stop to search for plaintiff's ticket but was unable to find it. Ms. Cranmer also searched for the ticket at the Short Stop on July 21, 1988, but was unable to find it. The ticket has never been located.

The only ticket matching the winning combination of numbers selected at the Kansas Cash Lotto drawing on July 20, 1988, was determined to have been sold at the Short Stop Convenience Store in Clay Center on July 17, 1988, at 1:35 p.m. This ticket was a $2 purchase. Plaintiff contends that the winning ticket matching all six numbers was the one he purchased from Ms. Cranmer for $1.

On June 28, 1989, plaintiff submitted a claim to the Joint Committee on Special Claims Against the State against the Kansas Lottery for $117,037 based on his alleged purchase of the winning lottery ticket for the July 20, 1988, drawing. On June 30, 1989, plaintiff submitted a letter to the Kansas Lottery to claim payment of his winning ticket. On July 14, 1989, Carl M. Anderson, an Assistant Attorney General representing the Kansas Lottery, notified plaintiff by certified mail that the Lottery Commission would not pay his claim unless his winning ticket and a completed claim form were presented by July 16, 1989. The Kansas Lottery also notified the Joint Committee that it would refuse payment unless plaintiff presented the winning ticket by July 16, 1989. The Kansas Legislature did appropriate the $117,037 for plaintiff's claim, but the Governor vetoed the appropriation.

Plaintiff initiated this action in the Shawnee County District Court against the State of Kansas, the Kansas State Lottery, and the Kansas State Lottery Commission on July 12, 1991, based on

his alleged purchase of the winning Kansas Cash Lotto ticket for the July 20, 1988, drawing. Plaintiff contended that he fulfilled his contractual obligation by paying consideration to obtain the lottery ticket and by submitting the winning ticket to an authorized retailer for validation and that responsibility for the lost ticket lies with the Lottery through its agent, the retailer which accepted the ticket for validation. Plaintiff further contended that defendants' breach of contract entitled him to payment of the $117,037 plus interest.

In their answer, defendants contended that the winning ticket for the July 20, 1988, drawing was a $2 purchase rather than a $1 purchase. Defendants denied that plaintiff submitted a winning ticket for validation or that plaintiff was the "holder" of the winning ticket. Defendants also asserted affirmative defenses, including failure to state a claim and lack of jurisdiction.

Defendants also filed a third-party claim against Leiszler Oil Company, seeking indemnification and alleging that the plaintiff's damages were the direct and proximate result of the negligence of Leiszler Oil and/or its employee, Pennie Cranmer. Leiszler Oil is the owner of the Short Stop Convenience Store. Leiszler Oil, in turn, filed a third-party claim against Pennie Cranmer, alleging that Ms. Cranmer was acting in her capacity as plaintiff's daughter and not as Leiszler Oil's employee when she retained plaintiff's lottery ticket on July 17, 1988, and that, because Ms. Cranmer was acting outside the scope of her employment, she was liable for any damages Leiszler was required to pay.

The district judge granted summary judgment for the defendants, finding that plaintiff's complaint failed to state a claim upon which relief could be granted. The court held that plaintiff was required to follow the Lottery Act and the rules and regulations of the Lottery and that plaintiff was not entitled to payment of the jackpot lottery prize because of his failure to comply with the statutes and the rules and regulations. The third-party claims filed by defendants and by Leiszler Oil were dismissed, subject to reinstatement should plaintiff prevail on his appeal.

On the back side of each Kansas Cash Lotto ticket is information concerning the claiming of prizes. Each ticket states:

"This ticket is a bearer instrument. Anyone eighteen and over possessing a winning ticket may claim the prize. Valid only for the date(s) shown. Winners must claim prize within 365 days from the drawing. All determinations of winners are subject to Kansas Lottery rules and regulations.

"To Claim The Prize: Present winning ticket to any Kansas On-line Retailer for processing.

"Important Notice: This ticket is the only proof of play(s). Make sure the numbers on the other side are the ones you chose. THIS TICKET IS VOID IF ALTERED."

Each ticket also has a place for the claimant to sign his or her name and address and for the retailer to fill in its retail number.

K.S.A. 74-8720(b) authorizes payment of prizes for winning lottery tickets "to one natural person who is adjudged by the executive director . . . to be the holder of such winning ticket or share." K.S.A. 74-8720(c) states that "[t]he executive director shall award the designated prize to the holder of the ticket or share upon the validation of a claim or confirmation of a winning share." The Kansas Lottery Commission, created by K.S.A. 74-8709, is authorized to adopt rules and regulations concerning the operation of the lottery, including the manner of payment of prizes to the holders of winning tickets. K.S.A. 74-8710. The primary controversy here centers on the determination of who is a "holder" of a winning ticket.

The Lottery Commission has adopted temporary rules and regulations. These have been published in the Kansas Register. The Lottery has never adopted permanent rules and regulations. Whether the Lottery's rules and regulations are temporary or permanent does not affect this litigation. Plaintiff's assertion that the temporary rules and regulations expire 120 days after adoption based on K.S.A. 77-422 is inaccurate because K.S.A. 74-8710 exempts the Lottery's temporary rules and regulations from the requirements of K.S.A. 77-415 *et seq.*

The temporary rules and regulations for the Kansas Lottery published in the Kansas Register provide that "[t]o be a valid ticket and eligible to receive a prize, a Cash Lotto ticket shall satisfy all the requirements established by the Kansas Lottery for validation of winning tickets." K.A.R. 111-7-8 (7 Kan. Reg. 1193 [1988]). A validated ticket is the only proof of play, and submission of a winning ticket is the only way to claim a prize. K.A.R. 111-

7-3(c) (7 Kan. Reg. 1192 [1988]). To validate a winning on-line ticket, the following requirements must be met:

"1) All printing on the ticket shall be present in its entirety, be legible, and correspond, using the computer validation file, to the combination and the date printed on the ticket.

"2) The ticket shall be intact.

"3) The ticket shall not be mutilated, altered or tampered with in any manner." K.A.R. 111-6-7(a) (7 Kan. Reg. 215 [1988]).

If any of these conditions are not met, the ticket is invalid and ineligible for a prize. The executive director of the Lottery makes the final decision on the validity of a winning ticket. K.A.R. 111-6-7(b). The rules and regulations also instruct that an on-line ticket is the only acceptable evidence of the combination of numbers selected. K.A.R. 111-6-1(e) (7 Kan. Reg. 213 [1988]). The Lottery is not responsible for lost tickets. K.A.R. 111-7-10(c) (7 Kan. Reg. 1193-94 [1988]). The procedure for claiming jackpot prizes is to "personally submit the signed ticket and a completed claim form to a Kansas regional or state lottery office." K.A.R. 111-7-9 (7 Kan. Reg. 1193 [1988]). This procedure does contradict the information on the back of the Kansas Cash Lotto tickets, which instructs the holder of a winning ticket to present the ticket "to any Kansas On-line Retailer for processing."

Plaintiff's letter to the Lottery requesting payment of the jackpot prize summarized his claim:

"On July 17, 1988, at approximately 1:30 P.M., I purchased one Quick Pick Kansas Cash Lottery ticket for $1.00 from the Short Stop Convenience Store located at 610 Sixth Street, Clay Center, Kansas 67432. I purchased the ticket from my daughter, Penny Cranmer, who was an employee at said convenience store at the time. Because I was going to be out of town at the time of the drawing for which said ticket was purchased, I asked my daughter, Penny Cranmer, to keep the ticket for me and to watch the drawing to be held the following Wednesday. Penny Cranmer wrote my name on the front of said ticket and placed it in a basket near the cash register in said convenience store. That is the last time anyone can remember seeing said Lottery ticket that was purchased by me on July 17, 1988, at approximately 1:30 P.M.

"The Kansas Cash Lottery drawing was held the following Wednesday, being July 20, 1988. Kansas Lottery authorities told Mr. Jack Haley, manager of said Short Stop Convenience Store, that there had been only one Kansas Cash Lottery ticket sold in Clay Center, Kansas, at 1:35 P.M. on July 17, 1988, and it had been the one sold at said Short Stop Convenience Store.

Mr. Haley was informed by Kansas Lottery officials that this was the winning ticket resulting from the Kansas Cash Lottery drawing held on July 20, 1988.

"Since it has been documented by the Kansas Lottery authorities that the winning ticket from the July 20, 1988, Kansas Cash Lottery drawing was purchased in Clay Center, Kansas, at the Short Stop Convenience Store at approximately 1:35 P.M., and since I purchased that ticket, I should be entitled to the prize of $117,037.00 from the Kansas Lottery. There is no doubt that I purchased the winning ticket selected at the July 20, 1988, Kansas Cash Lottery drawing. The fact that said ticket was lost does not change the fact that I purchased the winning ticket selected at the July 20, 1988, Kansas Cash Lottery drawing. I am entitled to the prize of $117,037.00 and I hereby make claim upon the Kansas Lottery for payment of said prize."

It is clear that plaintiff did not comply with the lottery rules and regulations for presenting his winning ticket to the Lottery. He neither presented it in person to a regional or state lottery office, nor did he present it to a retailer for processing. The executive director and the Lottery Commission determined that plaintiff was not a holder of a winning ticket. The position adopted by the Lottery Commission was that plaintiff must submit his valid winning ticket and a completed claim form to claim his prize. Submission of the ticket and claim form was required to be within one year of the June 20, 1988, drawing. K.A.R. 111-7-9(d).

The term "holder" is not defined in either the Kansas Lottery Act or the temporary rules and regulations enacted by the Lottery Commission. Generally, however, "[t]he holder of a bill of exchange, promissory note, check, or other commercial paper, is the person who has legally acquired possession of the same, by indorsement or delivery, and who is entitled to receive payment of the instrument." Black's Law Dictionary 731 (6th ed. 1990). Each lottery ticket clearly states that it is a "bearer instrument." "Bearer" means "[t]he person in possession of an instrument." Black's Law Dictionary 154 (6th ed. 1990). "Ticket bearer" is defined in K.A.R. 111-6-1(i) as "the person who has signed the on-line ticket or who has possession of an unsigned ticket." Other jurisdictions have held or noted that to be a "holder" of a winning lottery ticket and to have a right to collect the winnings, one must have possession of the ticket. See, *e.g.*, *Brown v. California State Lottery Com'n.*, 232 Cal. App. 3d 1335, 284 Cal. Rptr. 108

(1991); *Ramirez v. Bureau of State Lottery,* 186 Mich. App. 275, 282, 463 N.W.2d 245 (1990), *rev. denied* 439 Mich. 861 (1991); *Karafa v. N.J. State Lottery Comm.,* 129 N.J. Super. 499, 503, 324 A.2d 97'(1974).

Plaintiff admits that he does not have possession of his ticket, nor did he sign his ticket. He is, therefore, not a ticket bearer or a holder. Plaintiff is not entitled to payment of the lottery prize he seeks.

Plaintiff argues that in enacting K.S.A. 74-8720 the legislature intended that a person in plaintiff's circumstances be considered a holder. Plaintiff's sole support for this theory is that the legislature in two separate years voted to pay plaintiff's claim. Plaintiff ignores that in K.S.A. 74-8720 the legislature gave the executive director of the Lottery or his designee the sole authority to determine who is a holder of a winning ticket. The executive director determined here that plaintiff must submit his winning ticket and a claim form in order to receive payment of the prize, and this determination was within the authority given him by the legislature.

Plaintiff was notified on the back of the ticket he purchased that he was required to follow the rules and regulations of the Lottery and that his ticket was the only proof of play. Plaintiff failed to follow the rules and regulations, and he did not retain his ticket as proof of play. To be a "holder" of a winning ticket and therefore entitled to the prize, plaintiff was required to have possession of a winning ticket. Plaintiff failed to comply with the procedure to claim his prize, and he did not have possession of a winning ticket nor had he signed a winning ticket. Plaintiff failed entirely to meet the requirements of claiming the prize he sought.

Plaintiff claims that the evidence that he purchased the winning ticket for the July 20, 1988, Kansas Cash Lotto drawing is overwhelming. However, denying his claim is consistent with other jurisdictions which have considered similar claims.

In *Ramirez,* 186 Mich. App. 275, payment to the claimant of a $1.5 million Lotto jackpot was denied. The claimant provided tickets showing he had played the same series of numbers for numerous bi-weekly Lotto drawings in the two-and-one-half month period before and in the month after the drawing he

claimed to have won. The tickets also showed that he had frequently played a second series of numbers at the same time. The winning ticket was determined to have included both combinations of numbers the plaintiff had a history of playing together. However, because plaintiff was unable to produce the winning ticket, he did not receive the prize. Although it was noted that there was no doubt that Ramirez had purchased the winning ticket, the Michigan Supreme Court declined to review the decision of the Court of Appeals. *Ramirez*, 439 Mich. 861.

In *Molina v. Games Mgt. Servs.*, 58 N.Y.2d 523, 462 N.Y.S.2d 615, 449 N.E.2d 395 (1983), plaintiff had a carbon copy showing she had purchased a ticket with the winning Lotto numbers. The rules and regulations of the lottery and the terms printed on the ticket provided that no ticket would be valid and qualify as a winner unless it had been microfilmed at the Lotto office before the drawing. The terms printed on the ticket also notified the player that the sales agents were acting on behalf of the player in validating tickets and returning them to the contractor (defendant Games Management Services). Plaintiff's ticket was never microfilmed, although she provided evidence that her ticket had been validated by a sales agent. She claimed that the courier must have lost her ticket. Because her ticket was never microfilmed, the court held that the plaintiff was not entitled to the prize.

In *Karafa*, 129 N.J. Super. 499, plaintiff claimed that he was the $50,000 winner of a lottery drawing. Several people were present when plaintiff discovered that he had the winning ticket, and a newspaper reported that plaintiff was a $50,000 winner. Plaintiff asked his mother to hold his ticket for safekeeping, but she threw it away with a batch of non-winning tickets. Because plaintiff was unable to produce the winning ticket, the executive director of the lottery commission denied his claim. The court denied plaintiff's claim, stating that the legislature intended payment only to the physical holder of a winning ticket. Therefore, plaintiff was not entitled to the $50,000 prize.

Plaintiff makes two main arguments as to why he is entitled to the jackpot prize despite his failure to comply with the statutes and the rules and regulations governing the Lottery. First, he claims that the Lottery had a practice of paying on lost or mu-

tilated tickets despite its written rules and regulations that lost or mutilated tickets would not be paid. Plaintiff argues that this practice was in effect during the time period when he made his claim, and the Lottery has only selectively enforced its written rules because plaintiff's lost ticket was for a jackpot prize rather than a lesser amount. Plaintiff claims that this practice either modified the terms of the contract he entered into with the Lottery by purchasing his ticket or establishes that the Lottery's denial of his claim was arbitrary, capricious, and discriminatory. Second, plaintiff claims that the written or unwritten rules which require him to submit his ticket to a retailer or to the Lottery were satisfied because he gave his ticket to an agent of the Lottery. Neither of plaintiff's arguments have merit based on the facts of this case.

Plaintiff's sole action against the Lottery here is based on judicial review of an agency action under the Kansas Act for Judicial Review and Civil Enforcement of Agency Actions (KJRA) K.S.A. 77-601 *et seq.*; he may not maintain a separate action for breach of contract. His argument that the Lottery's denial of his claim was arbitrary or capricious based on its prior practice is reviewable under the KJRA. K.S.A. 77-621(c)(8). Even if the Lottery is bound by its practice of paying on lost or mutilated tickets, plaintiff cannot establish that the Lottery's decision was arbitrary or capricious in this case, and therefore there was no error by the district court in granting summary judgment to the defendants. Further, even if plaintiff could maintain a breach of contract action by showing that the terms of a contract between plaintiff and the Lottery were modified by the Lottery's practice of paying lost or mutilated ticket claims, plaintiff cannot establish that he complied with the requirements of the "modified contract."

Plaintiff's evidence of the Lottery's practice of paying on lost or mutilated tickets consists of two types. First, plaintiff points to inter-office memoranda, two in particular, which plaintiff claims shows the Lottery's acknowledgement of its practice of paying on lost or mutilated tickets. Second, plaintiff deposed Jimmy Huff, the former director of security and of administration for the Lottery. Plaintiff alleges that Huff's deposition shows the extent of the Lottery's practice of paying on lost or mutilated tickets.

The first memorandum is from games accounting manager Kevin Scott informing the assistant attorney general for the Lottery of the practice of processing claims without having actual tickets. This memorandum refers to instant ticket games and states:

"Being that by reconstruction we could determine the status of the ticket (a winner or not), and IF no other claim was made on the same ticket, and IF no other information concerning the ticket was brought to the attention of the lottery (i.e., stolen, etc), that the claim could be paid AFTER the official expiration of the game. To my recollection this proposed practice was discussed and agreed upon by Larry Gray, Mike Craighead, and Jim Huff, and was then directed to me by my supervisor, Mike Craighead."

It also lists, categorized by game, the number of instant tickets which had been reconstructed and paid: 205 tickets totalling $10,337 were reconstructed and paid.

The second memorandum is from the assistant attorney general for the Lottery to Scott. It directs Scott to pay two claims where the "actual tickets and claim forms in these cases were never received by the Lottery" but were "presented during a period of time when the Kansas Lottery was honoring claims based upon copies of tickets and claim forms." One of the two claims was a Holiday Cash instant ticket purchased at the same Short Stop Convenience Store where plaintiff alleges he purchased his winning Kansas Cash Lotto ticket. The memorandum states, "In view of our treatment of similar claims in the past, we believe that it is imperative that these claims be honored following the expiration of 'Holiday Cash' on June 11, 1990." The memorandum concludes, "In accordance with the Commission's determination on March 2, 1990, we will not honor such claims in the future, except in those instances [where] validation has occurred at the retail level as set forth in our rules and regulations."

In his deposition, Huff discussed the Lottery's practice of paying claims on tickets which were lost or mutilated. Huff stated that as director of security, he often made decisions on whether to pay on altered tickets or questionable claims until, based on an Attorney General's opinion, it was decided that the Lottery's legal department would make the decision on questionable claims. Plaintiff's counsel presented Huff with deposition exhibits showing copies of torn tickets or claims which were lost on which the

claimant was paid; Huff admitted that it looked like the Lottery had paid these claims. However, Huff stated repeatedly during his deposition that there was always some form of evidence, either a portion of a ticket or a copy of a ticket or claim form, present when the Lottery paid on lost or mutilated ticket claims.

Huff discussed the process of reconstructing tickets to determine if they were winning tickets. He stated that he did not recall ever denying a claim where there was some evidence of a winning ticket. He admitted to paying a claim where the only supporting documentation was a ticket number, stating that "in order to come up with a ticket number, there had to be some part of the ticket or xerox copy of it" but admitting that the claimant might just have written the number down from the ticket before it was lost. Huff also admitted that claims were paid where

"the winner claim form is made out by the person claiming it, and they usually, rather than staple the ticket to the winner claim form, would put it in the envelope and it would get lost, with the ticket number at that point in time. We were just assuming that they had the ticket, because they couldn't have wrote [sic] down the ticket number without the ticket."

Huff also discussed one incident in which a ticket and claim form were lost in the mail, and the $902 prize was paid after the claim was verified but apparently before the claimant sent in a copy of his claim form and validation.

It does not appear that the Lottery denies it had a practice of paying on some lost or mutilated tickets during the period in which plaintiff attempted to claim his prize. Defendants merely indicate that the payments on lost or mutilated ticket claims were for instant tickets (rather than on-line tickets) and that the Lottery never paid a claim of the type presented in this case without actual presentation of the winning ticket. Plaintiff responds that the Lottery has paid on lost or mutilated on-line tickets and that in fact no claim has ever been made on the highest prize in a game where the retailer lost the ticket.

It does not matter which type of tickets the Lottery had a practice of paying when the tickets were lost or mutilated, although the evidence does show that some mutilated on-line tickets were paid. The plaintiff here did not meet the criteria for payment on a lost or mutilated ticket, whatever the type of ticket or game or amount of prize.

Huff's deposition is filled with exhibits and examples of payment on claims where the ticket was lost or mutilated or the only evidence was a copy of the claim form. Instant tickets were paid on, for example, where the ticket was mutilated (sent through the washing machine), where the "void if removed" portion of the ticket had been removed by the retailer, or where the ticket was lost but there was a copy of the ticket or the claim form at least indicated the ticket number. In each of these cases, there was at the minimum a ticket number by which the ticket could be reconstructed to determine if it was a winning ticket. On-line ticket claims were paid, for example, where the ticket was mutilated, where the ticket was validated and turned into a regional office which then lost the ticket and claim form and the claimant produced a copy of the ticket and claim form, and where the on-line validation receipt and ticket and claim form were mailed in by the claimant but evidently lost in the mail and the claimant produced a copy of the ticket and claim form. Each of these on-line examples involved at the very least a copy of a claim form with either a copy of the ticket or validation receipt or validation number.

These examples all have a minimal factor in common: There was always *some* physical evidence of a ticket or claim form or ticket or validation number. Therefore, the Lottery was able to reconstruct the ticket or verify that it was a winning ticket. None of these examples are based merely on claimant's assertion that he purchased a winning ticket.

Huff discussed the method of verifying a winning on-line ticket. He stated that by running a transaction file report and checking the numbers listed on the ticket against the numbers listed in the report, it could be determined where and when a ticket with the winning series of numbers was purchased. The transaction file report would show the same numbers in the same sequence as the numbers shown on the claimant's on-line ticket, and in that manner the ticket would be verified. This was the method used to determine where and when the winning ticket for the July 20, 1988, Kansas Cash Lotto drawing was sold.

Plaintiff relies on *Zinke & Trumbo, Ltd. v. Kansas Corporation Comm.*, 242 Kan. 470, 749 P.2d 21 (1988), and argues that "where the agency adjudicates a matter similar in circumstance to pre-

vious adjudications, the agency must show why the circumstances in the case at hand are sufficiently different to warrant a different outcome." Plaintiff claims that the Lottery had paid more than 200 claims on lost or mutilated tickets, similar to the claim he has made, including a lost ticket purchased at the same store where he purchased his ticket, and therefore the Lottery must either pay him or distinguish his case. He claims that the Lottery's failure to pay his claim is arbitrary, capricious, and discriminatory.

The facts here do not show that the Lottery changed its practice in refusing to pay plaintiff's claim. Plaintiff's claim is not similar in circumstance to the prior claims on lost or mutilated tickets. In each of those cases, there was some evidence of a ticket, a claim form had been filled out, or the ticket had been validated at some point. Here, there is no such evidence. Plaintiff has not established that payment was ever made where a ticket was lost before validation and never presented for validation or payment. Plaintiff never validated his winning ticket or submitted his winning ticket to a regional or state office or to a retailer. In fact, it does not appear from the record that plaintiff even knew what number combination his Kansas Cash Lotto Quick Pick ticket contained. The only reason plaintiff believes he had a ticket with the winning combination of numbers for the July 20, 1988, drawing is that he and his daughter remember he purchased a ticket at approximately the same time and at the same store that the winning ticket was determined to have been purchased. There is no evidence that the Lottery has ever paid on a lost ticket based on similar evidence.

Plaintiff also argues that the only reason the Lottery denied his claim is because his claim was for a jackpot prize, greater than any amount the Lottery had previously paid on lost or mutilated ticket claims. This is not established by the record. It cannot be said that the Lottery would have paid plaintiff had his claim been for a $1 prize rather than for jackpot prize of $117,037. The Lottery's practice of paying lost or mutilated ticket claims was based on its ability to reconstruct the ticket or verify that it was a winning ticket. Plaintiff has not established the minimal proof necessary to warrant payment of this prize even if the Lottery is bound by its practice of paying on lost or mutilated tickets.

Plaintiff also asserts that defendants want to ignore the reliance players and retailers placed on the Lottery's practice of paying on lost or mutilated tickets. If players and retailers did indeed rely on the Lottery's practice of paying on lost or mutilated tickets, such reliance would be misplaced considering the language on the back of each ticket indicating that it is a "bearer instrument" and considering the statutory language and the rules and regulations requiring a holder of a winning ticket to properly validate it to claim the prize.

To succeed in his petition for judicial review of an agency action under the KJRA, plaintiff must establish that the Lottery's denial of his claim was arbitrary or capricious. Even if the Lottery must distinguish plaintiff's claim from the previous lost or mutilated ticket claims on which it had a practice of paying, that distinction is easily made. The Lottery had some evidence that the claimant had possessed a winning ticket on each lost or mutilated ticket claim paid. It is uncontroverted that plaintiff lost his ticket before the drawing, so he never possessed a winning ticket. There is no evidence that the Lottery had ever paid on a lost ticket based solely on a claimant's mere assertion that he or she purchased a ticket at a certain place and time after it is determined that a winning ticket was sold at that place and time. Plaintiff is unable to establish that the Lottery's denial of his claim was arbitrary or capricious, and his petition for judicial review must fail.

Plaintiff also argues that the Short Stop, an authorized lottery retailer, was the Lottery's agent. Plaintiff claims that when he gave his ticket to Ms. Cranmer, an employee of the Lottery's agent, he submitted the ticket to the Lottery. At the very least, he argues, there are questions of fact as to whether the Short Stop was acting as the Lottery's agent when plaintiff gave Ms. Cranmer his ticket and as to whether Ms. Cranmer was acting in her capacity as the agent's employee when she retained his ticket, and this justifies reversing the trial court. Plaintiff discusses agency principles and argues that giving his ticket to an employee of the Lottery's agent put the Lottery in possession of his ticket. By putting the Lottery in possession of his ticket, plaintiff claims he complied with the rules and regulations of the Lottery.

The facts are not disputed. Both plaintiff and Ms. Cranmer have stated that plaintiff asked his daughter to hold his ticket

and to check the winning numbers for the next drawing because he was going to be out of town. What plaintiff's argument ignores is that he gave his ticket to Ms. Cranmer as his daughter and not in her capacity as the employee of the Lottery's agent.

Ms. Cranmer's affidavit shows that the day after plaintiff asked her to hold his ticket, she checked her purse and realized the ticket was not there. This indicates that Ms. Cranmer expected to personally retain control of plaintiff's ticket. Further, Ms. Cranmer states that she purchased another Kansas Cash Lotto ticket to replace the one that her father purchased, which also indicates her personal responsibility for retaining plaintiff's ticket.

When plaintiff gave his ticket to Ms. Cranmer, it was not a winning ticket; the drawing had not yet been held. Plaintiff did not turn his ticket in for validation as he claims; a ticket cannot be validated unless it is a winning ticket. Neither the Lottery nor its agent received plaintiff's ticket for validation. Plaintiff's agency argument fails because an agent of the Lottery never received his ticket for validation.

Plaintiff notes, however, that "[n]o employee nor corporate principal was informed, either orally or in writing, to not take tickets until after a game was played." Common sense dictates that retailers not retain tickets for customers to check against the winning numbers after a drawing; far too many tickets are sold for any retailer to collect tickets before a drawing.

Still, plaintiff claims that he signed his winning ticket and gave it to an authorized lottery retailer, and he states, "The Lottery seems to argue Mr. Fowles was required to retrieve the ticket from the retailer so he could then resubmit it to the same retailer." First, plaintiff did not sign his ticket; his daughter wrote his name on the front of the ticket. Further, plaintiff's ticket was not a winning ticket when he gave it to Ms. Cranmer. Finally, plaintiff gave his ticket to his daughter, not to a lottery retailer.

There is no question of fact as to agency here. It is uncontroverted that plaintiff lost his ticket before the July 20, 1988, drawing and that he never had his ticket validated. Giving his ticket to his daughter, who is employed by an authorized lottery retailer but who accepted the ticket in her capacity as plaintiff's daughter, does not support a finding that plaintiff submitted his ticket to an agent of the Lottery.

Summary judgment is appropriate

"where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. When summary judgment is challenged on appeal, we must read the record in the light most favorable to the party who defended against the motion. We must reverse when we find that reasonable minds could differ as to the conclusions drawn from the evidence." *Hollenbeck v. Household Bank,* 250 Kan. 747, 750, 829 P.2d 903 (1992).

The trial court did not err in granting defendants' motion for summary judgment.

Affirmed.