No. 83,264

RICHARD J. SCHALL, *Appellant*,
v. WICHITA STATE UNIVERSITY, *Appellee*.

(7 P.3d 1144)

Opinion filed June 9, 2000.

*Sean M. Dwyer*, of Law Office of Sean M. Dwyer, of Wichita, argued the cause and was on the brief for appellant.

*Wm. Scott Hesse*, assistant attorney general, argued the cause, and *Carla J. Stovall*, attorney general, was with him on the brief for appellee.

The opinion of the court was delivered by

ABBOTT, J.: The trial court granted summary judgment to the defendant, Wichita State University (WSU), and against the plaintiff, Richard J. Schall, in an action against WSU, alleging breach of contract as well as claims made pursuant to the Family Medical Leave Act (FMLA) and the Americans with Disabilities Act (ADA). Schall served as the clinical supervisor/coordinator for the Physicians Assistant Department (PAD) at WSU from August 1993, until he was terminated in February 1997, as a result of chronic pain secondary to cervical disc disease. Plaintiff's appeal was transferred to this court pursuant to K.S.A. 20-3018(c).

Schall was hired as a full-time salaried, exempt, clinical supervisor/coordinator for the PAD at WSU in August 1993. Marvis Lary, Ph.D., was Schall's direct supervisor during the entire time he was employed by WSU. Schall was the only clinical supervisor for the PAD at WSU. Schall's job duties required that he

"● IDENTIFY CLINICAL ROTATION SITES IN AREAS OF NEED
● SERVE AS DEPARTMENT LIAISON TO CLINICAL PRECEPTORS
● IMPLEMENT ALL CORRESPONDENCE TO PRECEPTORS

  ● SCHEDULING
  ● CONFIRMATION LETTERS
  ● STUDENT EVALUATION FORMS
  ● LEARNING OBJECTIVES

● PLAN ROTATION SCHEDULE FOR STUDENTS
● MAKE CLINICAL SITE VISITS
● PROCTOR SENIOR CASE PRESENTATIONS
● SERVE AS ADVISOR ON SENIOR RESEARCH PAPERS
● PLAN AND IMPLEMENT ANNUAL JOB FAIR
● IMPLEMENT SENIOR REVIEW WEEKS I & II

● MAINTAIN CURRENT AFFILIATION AGREEMENTS ON ALL PRECEPTOR PHYSICIANS AND MEDICAL FACILITIES
● OVERSEE FIELD COORDINATOR PROJECT
● [GIVE] STUDENT EVALUATIONS & GRADES
● [SERVE AS] EDITOR OF DEPARTMENT JOB LISTINGS"

There is no other position like the clinical supervisor/coordinator for the PAD in Kansas. The supervisory position is dissimilar from regular faculty positions as it required significant travel to various

sites around Kansas, especially to rural areas. Schall's employment was governed by WSU's unclassified professional personnel policy and procedures.

Schall visited with his physician, Dr. Robert Sweet, on April 12, 1996, after he began experiencing pain in his back, neck, shoulder, and arm. On June 20, 1996, Schall had a diskectomy of the C5-C6, C6-C7, and fusion at that level. Schall was off work for 3 weeks following the surgery. Although Schall continued to have pain, he continued to work after the surgery. Schall had difficulty typing and took Percocet to alleviate the pain.

On September 12, 1996, Schall consulted Dr. Eustaquio O. Abay about his severe pain. After the September 12 consultation, Schall worked sporadically but did not work full-time. Schall was unable to drive for more than 30 minutes outside Wichita to make site visits with senior students as required by his job. Schall continued to have difficulty typing long documents because of the pain.

On October 16, 1996, Dr. Abay performed a decompressive laminectomy, C6-C7, with a foraminotomy of the C7 roots bilaterally, "sitting position" surgery on Schall. Schall's hospital stay was 7 or 8 days. Other faculty attempted to fill in for Schall while he was recovering from surgery. Schall worked on November 18, 19, and December 10, 1996. Schall never worked again, other than those days after his October 16 surgery. On November 26, 1996, Dr. Abay released Schall to return to work. Schall never gave the work release to Lary.

On December 5, 1996, Dr. Sweet wrote a letter to Frankie M. Brown, Assistant Director of Human Resources at WSU, requesting that Schall be granted a medical leave of absence, which was granted.

On January 9, 1997, Lary wrote Schall and requested that he return to work full time on or before February 3, 1997. Schall did not return to work on February 3. On February 3, 1997, Lary wrote Schall another letter and gave Schall a deadline to return to work full time on February 10, 1997. Schall instead requested that he be allowed to return to work on a part-time basis, working approximately 20 to 30 hours per week for 6 to 8 weeks and then full time thereafter. Lary informed the PAD of Schall's proposal to work on

a part-time basis. On February 11, 1997, the four other PAD faculty members wrote Lary a letter expressing their concern about Schall's request to work part time. The members described the PAD as "dysfunctional" as a result of Schall's failure to perform his job duties. The members told Lary that they were unable to keep up with their own workload as they had to assume some of the job responsibilities that Schall had not been able to complete. The members further expressed an opinion that Schall would not be able to adequately satisfy the requirements of his job if he were to work part time.

On February 12, 1997, Lary sent Schall a letter immediately terminating his employment. Lary was concerned that Schall would no longer be able to provide the attention necessary to adequately supervise the PAD and that the quality of the education of the senior students was at risk as was the next year's class placements.

Schall filed an internal grievance following his termination. After hearing from Schall and Lary, the grievance committee recommended that "Schall should be paid part-time wages from February 14, 1997 through June 30, 1997," which is the end of the contract period at WSU. Schall appealed to the Senate Grievance Review Committee, which recommended that "Schall receive a maximum amount of one month's salary, computed at his most recent pay level, plus a dollar amount equal to 6 months of his personal health insurance premium." WSU President Eugene Hughes adopted the recommendation of the Senate Grievance Review Committee's decision. In his written decision, President Hughes did not state which agency officer was to receive service of a petition for judicial review on behalf of the agency. Schall has never received any money from WSU.

## I. IMMUNITY

Because WSU is an arm of the State, WSU argues that the Eleventh Amendment to the United States Constitution provides immunity on both the ADA and FMLA claims. The Eleventh Amendment reads: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or

prosecuted against one of the Unites States by citizens of another State, or by Citizens or Subjects of any Foreign State."

Historically, courts have held that the Eleventh Amendment does *not* apply to suits brought in state courts. The United States Supreme Court in *Hilton v. South Carolina Public Railways Commission*, 502 U.S. 197, 116 L. Ed. 2d 560, 112 S. Ct. 560 (1991), considered this issue after a plaintiff had brought a Federal Employers Liability Act (FELA) claim in state court against the defendant after being injured as a result of the defendant's negligence. In reversing the South Carolina Supreme Court, the *Hilton* Court noted that the Supreme Court has stated "on many occasions" that the Eleventh Amendment does not apply to actions brought in state courts. 502 U.S. at 204-05.

This court, in *Americare Properties, Inc. v. Whiteman*, 257 Kan. 30, 891 P.2d 336 (1995), also addressed the issue of Eleventh Amendment immunity in state courts when we considered a 42 U.S.C. § 1983 claim brought by the plaintiff. We held that the Eleventh Amendment prohibits suits against sovereign states in federal court but that it had no application to suits brought in state court. 257 Kan. at 51. See also *Gumbhir v. Kansas State Board of Pharmacy*, 231 Kan. 507, 513, 646 P.2d 1078 (1982) (the Eleventh Amendment does not apply to suits brought in state courts).

Other courts have similarly held. See *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 63-64, 105 L. Ed. 2d 45, 109 S. Ct. 2304 (1989) (holding that the Eleventh Amendment does not apply to state courts); *Maine v. Thiboutot*, 448 U.S. 1, 9 n. 7, 65 L. Ed. 2d 555, 100 S. Ct. 2502 (1980) (actions brought in state courts do not present an Eleventh Amendment problem as the Amendment only applies to federal courts); *McGregor v. Goord*, 180 Misc. 2d 945, 947, 691 N.Y. S. 2d 875 (1999) (holding that the Eleventh Amendment does not provide immunity for a state when an action is brought in state court, thereby allowing the court to consider the plaintiff's FMLA claim); *Ahern v. State of New York*, 244 App. Div. 2d 7, 11, 676 N.Y.S. 2d 232 (1998) (quoting *Hilton* and holding that the Eleventh Amendment does not apply to actions in state courts); *Whittington v. State Dept. of Public Safety*, 126 N.M. 21, 23, 966 P.2d 188 (1998) (quoting *Hilton* and holding that the Elev-

enth Amendment did not give the Department of Public Safety immunity from suit in state court); *Bunch v. Robinson*, 122 Md. App. 437, 456, 712 A.2d 585 (1998) (referencing *Will* and holding that the trial court erred when it applied the Eleventh Amendment to the case as the action was brought in state court and not federal court); and *Jacoby v. Arkansas Dep't of Education*, 331 Ark. 508, 513, 962 S.W.2d 773 (1998) (holding that the Eleventh Amendment does not apply to actions brought in state courts as the *Hilton* Court "makes abundantly clear").

The United State Supreme Court in *Alden v. Maine*, 527 U.S. 706, 144 L. Ed. 2d 636, 119 S. Ct. 2240 (1999), however, recently allowed the State of Maine to assert immunity even though the action was brought in state court. In *Alden*, the plaintiffs, a group of probation officers, filed suit against the State of Maine, alleging that the State had violated the overtime provisions of the Fair Labor Standards Act (FLSA). The suit was originally brought in federal court, but when it was dismissed, it was re-filed in state court in Maine.

The suit was dismissed in state district court on the basis of sovereign immunity, which the Maine Supreme Judicial Court affirmed. Noting that the "Eleventh Amendment does not explicitly protect the states from suit in their own courts," the Maine Supreme Court concluded that the State was immune from suits of this nature as a result of its inherent sovereignty. *Alden v. State*, 715 A.2d 172, 174-75 (Me. 1998). Sovereignty, the court held, is reflected in the Eleventh Amendment but not controlled by it. 715 A.2d at 173-74.

The United States Supreme Court, writing through Justice Kennedy, noted that although the Eleventh Amendment provides immunity to the states when an action is brought in federal court, the immunity is not derived from the language of the Amendment but that the Amendment is a realization of a state's sovereignty that existed prior to the ratification of the Constitution. 527 U.S. at 713. The *Alden* Court stated:

"We have, as a result, sometimes referred to the States' immunity from suit as 'Eleventh Amendment immunity.' The phrase is convenient shorthand but something of a misnomer, for the sovereign immunity of the States neither derives

from, nor is limited by, the terms of the Eleventh Amendment. Rather, as the Constitution's structure, its history, and the authoritative interpretations by this Court make clear, the States' immunity from suit is a fundamental aspect of the sovereignty which the States enjoyed before the ratification of the Constitution, and which they retain today (either literally or by virtue of their admission into the Union upon an equal footing with the other States) except as altered by the plan of the Convention or certain constitutional Amendments." 527 U.S. at 713.

The *Alden* Court further noted that the Eleventh Amendment was a reaction to the decision in *Chisholm v. Georgia*, 2 U.S. (2 Dall.) 419, 1 L. Ed. 440 (1793), and its purpose was not to define the states' immunity but to "restore the original constitutional design." 527 U.S. at 722. The Court then examined several cases that had been before it over the last two centuries and concluded:

"These holdings reflect a settled doctrinal understanding, consistent with the views of the leading advocates of the Constitution's ratification, that sovereign immunity derives not from the Eleventh Amendment but from the structure of the original Constitution itself. [Citations omitted.] The Eleventh Amendment confirmed, rather than established, sovereign immunity as a constitutional principle; it follows that the scope of the States' immunity from suit is demarcated not by the text of the [Eleventh] Amendment alone but by fundamental postulates implicit in the constitutional design." 527 U.S. at 728-29.

The *Alden* Court noted that in previous cases, such as *Hilton* and *Will*, it had suggested that the Eleventh Amendment did not apply in state courts because of the language of the Amendment, but distinguished those cases by stating that "the bare text of the Amendment is not an exhaustive description of the States' constitutional immunity from suit." 527 U.S. at 736.

In concluding, the *Alden* Court stated:

"In light of the language of the Constitution and the historical context, it is quite apparent why neither the ratification debates nor the language of the Eleventh Amendment addressed the States' immunity from suit in their own courts. The concerns voiced at the ratifying conventions, the furor raised by *Chisholm*, and the speed and unanimity with which the Amendment was adopted, moreover, underscore the jealous care with which the founding generation sought to preserve the sovereign immunity of the States. To read this history as permitting the inference that the Constitution stripped the States of immunity in their own courts and allowed Congress to subject them to suit there would turn on its head the concern of the founding generation—that Article III might be used to circumvent state-court immunity. In light of the historical record it is difficult to conceive that

the Constitution would have been adopted if it had been understood to strip the States of immunity from suit in their own courts and cede to the Federal Government a power to subject nonconsenting States to private suits in these fora." 527 U.S. at 743.

The *Alden* Court therefore held that "the powers delegated to Congress under Article I of the United States Constitution do not include the power to subject nonconsenting States to private suits for damages in state courts." 527 U.S. at 712.

Several state courts have addressed the issue of state immunity since *Alden* and held that a state has immunity from suit even when the action is brought in state court. See *Bachmeier v. Hoffman,* (2000 WL 313585) (Wyo. 2000) (noting that *Alden* reaffirmed that states have sovereign immunity in an action brought in state courts); *Erickson v. Board of Governors for N.E. Ill. Univ.,* 207 F.3d 945, 952 (7th Cir. 2000) (noting that after Alden, states may "implement a blanket rule of sovereign immunity"); *Commonwealth v. Luzik,* 259 Va. 198, 208, 524 S.E.2d 871 (2000) (applying *Alden* and holding that the state has sovereign immunity from FLSA claims even when the claim is brought in state court); *Lawson v. University of Tennessee,* 2000 WL 116312 (Tenn. Ct. App. 2000) (holding that the state cannot be sued in an action pursuant to the FLSA even when the suit is brought in state court following the decision in *Alden*); *Boise Cascade Corp. v. Board of Forestry,* 164 Or. App. 114, 118-19, 991 P.2d 563 (1999) (referring to *Alden* and considering the defendant's immunity claims under the Eleventh Amendment); *Whittington v. State,* 128 N.M. 338, 992 P.2d 889 (1999) (vacating the earlier *Whittington* decision in light of *Alden* and holding that states enjoy immunity from FLSA lawsuits even when the suit is brought in state court); *Jacoby v. Arkansas Dep't of Education,* 338 Ark. 505, 506, 995 S.W.2d 353 (1999) (ordering a rebriefing on the issue of immunity following the decision in *Alden*); and *Allen v. Fauver,* 327 N.J. Super. 14, 18, 742 A.2d 594 (1999) (quoting *Alden* and holding that a state's immunity "flowed from the fundamental aspects of sovereignty enjoyed by the states before ratification of the United States Constitution").

Even though the *Alden* Court held that a state may assert its sovereign immunity when claims are brought against it in its own

courts, the *Alden* Court emphasized that the state's immunity may still be waived or be abrogated by Congress when legislation is passed pursuant to its power under § 5 of the Fourteenth Amendment. The *Alden* Court stated:

"We have held also that in adopting the Fourteenth Amendment, the people required the States to surrender a portion of the sovereignty that had been preserved to them by the original Constitution, so that Congress may authorize private suits against nonconsenting States pursuant to its § 5 enforcement power. *Fitzpatrick v. Bitzer*, 427 U.S. 445 (1976). By imposing explicit limits on the powers of the States and granting Congress the power to enforce them, the Amendment 'fundamentally altered the balance of state and federal power struck by the Constitution.' *Seminole Tribe*, 517 U.S. at 59. When Congress enacts appropriate legislation to enforce this Amendment, see *City of Boerne v. Flores*, 521 U.S. 507 (1997), federal interests are paramount, and Congress may assert an authority over the States which would be otherwise unauthorized by the Constitution." 527 U.S. at 756.

Kansas has sovereign immunity from claims by individuals based on federal law even when they are brought in state court. Kansas' sovereign immunity may still be waived or be abrogated by Congress, however.

## II. ADA CLAIM

Courts have set forth three ways that state immunity may be relinquished: (1) where the state has consented to suit; (2) where the application of *Ex parte Young*, 209 U.S. 123, 52 L. Ed. 714, 28 S. Ct. 441 (1908), and its progeny is appropriate; or (3) where Congress has abrogated the state's immunity. *Nelson v. Miller*, 170 F.3d 641, 646 (6th Cir. 1999). Kansas has not consented to be sued on either the ADA or FMLA claims in this matter and *Ex parte Young* is not applicable.

The United States Supreme Court in *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 134 L. Ed. 2d 252, 116 S. Ct. 1114 (1996), set forth a two-part test to determine whether Congress has abrogated a state's immunity when enacting legislation. First, Congress must unequivocally express its intent to abrogate the immunity, and second, Congress must act pursuant to a valid exercise of its power in abrogating the immunity. 517 U.S. at 55.

Congress has unequivocally expressed its intent to abrogate the State's immunity under the ADA. 42 U.S.C. § 12202 (1994) of the ADA states: "A State shall not be immune under the eleventh amendment." The first prong of the *Seminole Tribe* test is, therefore, satisfied.

Congress acts pursuant to a valid exercise of power in abrogating the states' immunity if Congress enacts legislation pursuant to the enforcement clause of the Fourteenth Amendment. *Seminole Tribe*, 517 U.S. at 55. Congress' power to pass legislation pursuant to the Fourteenth Amendment is very broad. *Katzenbach v. Morgan*, 384 U.S. 641, 651, 16 L. Ed. 2d 828, 86 S. Ct. 1717 (1966). Congressional power under the Fourteenth Amendment is not unlimited, however. The Supreme Court retains the power to decree the substance of the Fourteenth Amendment's restrictions on the states, and Congress may not enlarge those rights. *City of Boerne v. Flores*, 521 U.S. 507, 524-25, 138 L. Ed. 2d 624, 117 S. Ct. 2157 (1997).

The question, therefore, becomes whether the ADA is a valid exercise of Congress' power under § 5 of the Fourteenth Amendment, thereby abrogating Kansas' sovereign immunity even in suits brought in its own courts.

The United States Supreme Court has developed a test for determining whether legislation was properly enacted pursuant to Congress' power under § 5 of the Fourteenth Amendment: (1) whether the statute may be regarded as an enactment to enforce the Equal Protection Clause; (2) whether it is plainly adapted to that end; and (3) whether it is not prohibited by, but is consistent with, the letter and spirit of the Constitution. *Katzenbach*, 384 U.S. at 651.

The ADA was enacted to enforce the Equal Protection Clause. 42 U.S.C. 12101(b)(4) (1994) sets forth that the purpose of the ADA was "to invoke the sweep of congressional authority, including the power to enforce the fourteenth amendment . . . in order to address the major areas of discrimination faced day-to-day by people with disabilities." The first prong of the *Katzenbach* test is satisfied by the ADA.

The ADA was also plainly adapted to enforce the Equal Protection Clause. Enforcement legislation must evidence a "congruence and proportionality" between the injury to be prevented or remedied and the means adapted to that end. *City of Boerne*, 521 U.S. at 520. The Fourteenth Amendment provides Congress authority to enact legislation if the court can perceive a basis upon which Congress might predicate a judgment that the state action "constituted an invidious discrimination in violation of the Equal Protection Clause." *Katzenbach*, 384 U.S. at 656. The disabled are protected against discrimination by the Equal Protection Clause. *Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 450, 87 L. Ed. 2d 313, 105 S. Ct. 3249 (1985). Congress has found that persons with disabilities suffer at the hands of discrimination. 42 U.S.C. § 12101(a). Congress set forth that

"(1) some 43,000,000 Americans have one or more physical or mental disabilities, and this number is increasing as the population as a whole is growing older;

"(2) historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem;

"(3) discrimination against individuals with disabilities persists in such critical areas as employment, housing, public accommodations, education, transportation, communication, recreation, institutionalization, health services, voting, and access to public services;

"(4) unlike individuals who have experienced discrimination on the basis of race, color, sex, national origin, religion, or age, individuals who have experienced discrimination on the basis of disability have often had no legal recourse to redress such discrimination;

"(5) individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion, the discriminatory effects of architectural, transportation, and communication barriers, overprotective rules and policies, failure to make modifications to existing facilities and practices, exclusionary qualification standards and criteria, segregation, and relegation to lesser services, programs, activities, benefits, jobs, or other opportunities;

"(6) census data, national polls, and other studies have documented that people with disabilities, as a group, occupy an inferior status in our society, and are severely disadvantaged socially, vocationally, economically, and educationally;

"(7) individuals with disabilities are a discrete and insular minority who have been faced with restrictions and limitations, subjected to a history of purposeful unequal treatment, and relegated to a position of political powerlessness in our society, based on the characteristics that are beyond the control of such individuals and resulting from stereotypic assumptions not truly indicative of the individual ability

of such individuals to participate in, and contribute to, society." 42 U.S.C. § 12101(a).

The provisions of the ADA are proportional to their remedial or preventative goal. *City of Boerne*, 521 U.S. at 532. In *Martin v. Kansas*, 190 F.3d 1120, 1128 (10th Cir. 1999), the court stated:

"[T]he remedial purposes of the ADA are tailored to remedying and preventing the discriminatory conduct, and are thus congruent and proportional to the injury to be prevented or remedied. The Act only prohibits discrimination against 'qualified individuals,' and it requires only 'reasonable accommodations' that do not impose an 'undue burden' on the employer."

The court in *Autio v. AFSCME, Local 3139*, 140 F.3d 802, 805 (8th Cir. 1998), discussed the second *Katzenbach* prong and stated:

"In passing the ADA, Congress was not attempting to make a substantive constitutional change. Rather, it was attempting to enforce a recognized Fourteenth Amendment right; equal protection. In [*City of Boerne v.*]*Flores*, the Court restated its long-held view that '[l]egislation which deters or remedies constitutional violations can fall within the sweep of Congress' enforcement power even if in the process it prohibits conduct which is not itself unconstitutional and intrudes into legislative spheres of autonomy previously reserved to the states.' *Flores*, 521 U.S. at 518, 117 S. Ct. at 2163 (quoting *Fitzpatrick v. Bitzer*, 427 U.S. 445, 455, 96 S. Ct. 2666, 2671, 49 L. Ed. 2d 614 (1976)). . . .

"Unlike the RFRA [Religious Freedom Restoration Act] struck down in *Flores*, the ADA is 'plainly adapted' as a remedial measure even though each individual violation of the ADA may not in and of itself be unconstitutional. The remedies provided in the ADA are not so sweeping that they exceed the harms they are sought to redress. Because of the clear 'evil' present in disability discrimination and the well-documented need for equal protection in this respect, the ADA is plainly adapted to 'the end of providing those with disabilities equal protection under the law."

The second *Katzenbach* prong is satisfied by the ADA. We also hold that the ADA is consistent with the letter and spirit of the Constitution, thereby satisfying the third *Katzenbach* prong.

Although the United States Supreme Court has not addressed this issue yet, the majority of courts that have addressed this issue have held that Congress effectively abrogated the states' Eleventh Amendment rights when it enacted the ADA. See *Garrett v. University of Alabama*, 193 F.3d 1214, 1218 (11th Cir. 1999) (holding that both the ADA and the Rehabilitation Act are within the scope

of Congressional power and that the states' Eleventh Amendment immunity was effectively abrogated by Congress); *Dare v. California*, 191 F.3d 1167, 1175 (9th Cir. 1999) (holding that the ADA is a "congruent and proportional exercise" of Congress' enforcement powers under § 5 of the Fourteenth Amendment and that Congress abrogated the states' Eleventh Amendment immunity); *Martin*, 190 F.3d at 1129 (affirming the district court and joining the majority of courts on this issue and holding that Congress effectively abrogated the state's immunity when it enacted the ADA); *Muller v. Costello*, 187 F.3d 298, 311 (2nd Cir. 1999) (distinguishing the ADA from the RFRA and holding that the ADA is narrowly tailored and is a "reasonable response to the problem of discrimination against people with disabilities"); *Amos v. Maryland Dept. of Public Safety*, 178 F.3d 212, 222-23 (4th Cir. 1999) (holding that Congress properly enacted the ADA within its Constitutional powers pursuant to § 5 of the Fourteenth Amendment); *Nelson v. Miller*, 170 F.3d at 648 (holding that "[i]t is clear from the language of the ADA" that Congress abrogated the states' rights under the Eleventh Amendment and that states cannot claim immunity in defending ADA claims from private citizens in federal court); *Autio*, 140 F.3d at 806 (finding that enforcement of the ADA is well within the "spirit and letter of the Constitution" and that the ADA is a proper exercise of Congress' enforcement power under § 5 of the Fourteenth Amendment, thereby abrogating states' immunity rights under the Eleventh Amendment); *Kimel v. State of Fla. Bd. of Regents*, 139 F.3d 1426, 1433 (11th Cir. 1998) (siding with the majority of courts which have addressed this issue and holding that the ADA is a valid abrogation of the states' Eleventh Amendment immunity); *Coolbaugh v. State of La.*, 136 F.3d 430, 438 (5th Cir. 1998) (holding that the ADA is a proper exercise of Congress' § 5 enforcement power under the Fourteenth Amendment, thereby depriving Louisiana of an immunity defense pursuant to the Eleventh Amendment); *Clark v. State of California*, 123 F.3d 1267, 1270 (9th Cir. 1997) (affirming the district court and holding that both the ADA and the Rehabilitation Act were validly enacted under the Fourteenth Amendment); *Crawford v. Indiana Dept. of Corrections*, 115 F.3d 481, 487 (7th Cir. 1997) (the ADA is similar

to the Age Discrimination and Employment Act, Congress was "well within its powers" under § 5 of the Fourteenth Amendment in addressing the issue of disability discrimination, and states cannot use the Eleventh Amendment to claim immunity from suits brought pursuant to the ADA); *Jones v. Commonwealth of Pennsylvania,* (2000 WL 15073) (E.D. Pa. 2000) (holding that the Eleventh Amendment offers no protection to states from the ADA and noting that a "strong majority" has held likewise); *Johnson v. State Technology Center at Memphis,* 24 F. Supp. 2d 833, 842 (W.D. Tenn. 1998) (noting that the "great weight of authority" has rejected states' claims of immunity under the Eleventh Amendment when facing an ADA claim brought by a private citizen in federal court); *Thrope v. State of Ohio,* 19 F. Supp. 2d 816, 821-22 (S.D. Ohio 1998) (noting that the "clear majority" of courts have held that the ADA is a proper exercise of congressional power and holding that Ohio could not claim immunity pursuant to the Eleventh Amendment from a claim brought in a class action lawsuit); *Lamb v. John Umstead Hosp.,* 19 F. Supp. 2d 498, 510 (E.D. N.C. 1998) (holding that the ADA falls within Congress' power to adopt legislation pursuant to § 5 of the Fourteenth Amendment and that the ADA is an "effective abrogation" of the states' immunity to suit under the Eleventh Amendment); *Meekison v. Voinovich,* 17 F. Supp. 2d 725, 730 (S.D. Ohio 1998) (holding that Congress effectively abrogated the states' immunity under the Eleventh Amendment); *Anderson v. Department of Public Welfare,* 1 F. Supp. 2d 456, 468 (E.D. Pa. 1998) (holding that the ADA is a "congruent and proportional response to unconstitutional discrimination against disabled individuals," thereby preventing Pennsylvania from using the Eleventh Amendment immunity as a defense to ADA claims made by private citizens in federal court); *Williams v. Ohio Dept. of Mental Health,* 960 F. Supp. 1276, 1282-83 (S.D. Ohio 1997) (noting that a "number of other courts" have found that Congress abrogated the states' Eleventh Amendment immunity when it enacted the ADA and holding likewise); *Mayer v. University of Minnesota,* 940 F. Supp. 1474, 1480 (D. Minn. 1996) (holding that both the Rehabilitation Act and the ADA were valid exercises of congressional power and that the University could not

assert Eleventh Amendment immunity); and *Martin v. Voinovich,* 840 F. Supp. 1175, 1187 (S.D. Ohio 1993) (noting with very little analysis that Congress unequivocally expressed its desire to abrogate states' Eleventh Amendment immunity, and holding that the plaintiff could proceed with his ADA claim against the state).

The United States Supreme Court has granted *certiorari* in *Garrett v. University of Alabama,* 193 F.3d 1214, solely on the issue of whether Congress effectively abrogated the states' immunity when it enacted the ADA.

A minority of courts have held that Congress failed to abrogate the states' immunity when it enacted the ADA. See *Erickson,* 207 F.3d at 951 (holding that the ADA is not "prophylactic legislation" and that the Eleventh Amendment provides Illinois protection from suits brought in federal courts); *DeBose v. Nebraska,* 186 F.3d 1087, 1088 (8th Cir. 1999) (holding that Congress did not abrogate the states' immunity when enacting the ADA); *Alsbrook v. City of Maumelle,* 184 F.3d 999, 1009-10 (8th Cir. 1999) (finding that the congressional record of the ADA fails to support the "proposition that most state programs and services discriminate arbitrarily against the disabled" and, therefore, holding that Congress did not validly abrogate Arkansas' Eleventh Amendment immunity from private suit in federal court; *Brown v. North Carolina Division of Motor Vehicles,* 166 F.3d 698, 708 (4th Cir. 1999) (finding that Congress went beyond a mere remedy of violations of constitutional rights and attempted to define the substance of those rights and holding that Congress did not abrogate the states' Eleventh Amendment immunity); *Hedgepeth v. Tennessee,* 33 F. Supp. 2d 668, 675 (W.D. Tenn. 1998) (agreeing with the minority of courts and holding that the ADA gives "the disabled a preferential right to treatment where no such right exists under the Equal Protection Clause" and holding that Congress did not effectively abrogate the states' immunity when it enacted the ADA); and *Nihiser v. Ohio Environmental Protection Agency,* 979 F. Supp. 1168, 1175 (S.D. Ohio 1997) (holding that the ADA did not meet the second prong of the *Katzenbach* test as there is no congruence and proportionality between the injury to be prevented and the remedies con-

tained within the ADA, thereby allowing the Ohio EPA to claim immunity under the Eleventh Amendment).

Having noted earlier that the United States Supreme Court has this issue before it at the present time and in all likelihood will file a decision which will control this issue in the next 12 to 14 months, we are in somewhat of a quandary. Recent trends would lead us to believe the Supreme Court will hold the ADA is a congruent and proportional exercise of Congress' enforcement powers under § 5 of the Fourteenth Amendment, thereby abrogating Kansas' sovereign immunity. We need not try to predict what the Supreme Court will hold, however, because the trial court held and substantial competitive evidence supports the finding that Schall is not a "qualified individual" as that term is used in the ADA (42 U.S.C. 12101 [1994] *et seq.*) because Schall could not perform the tasks assigned to the clinical supervisor.

To establish a prima facie case under the ADA, a plaintiff must demonstrate: (1) that he or she is a *disabled person* within the meaning of the ADA, (2) that he or she is *qualified*, that is, able to perform the essential functions of the job, with or without reasonable accommodations; and (3) that the employer terminated the plaintiff under circumstances which give rise to an inference that the termination was based on his or her disability. *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997); *Lowe v. Angelo's Italian Foods, Inc.*, 87 F.3d 1170, 1173 (10th Cir. 1996); *White v. York Intern. Corp.*, 45 F.3d 357, 360-61 (10th Cir. 1995). Only the first two elements are at issue in this case. The worker has the burden to prove that he or she has a disability and that he or she is a qualified individual under the Act. *Monette v. Electronic Data Systems Corp.*, 90 F.3d 1173, 1184 (6th Cir. 1996); *Tenbrink v. Federal Home Loan Bank*, 920 F. Supp. 1156, 1161 (D. Kan. 1996); *Dutton v. Johnson County Bd. of County Comm'rs*, 859 F. Supp. 498, 504 (D. Kan. 1994).

This issue concerns both questions of law and questions of fact. We will review a district court's finding of fact with great deference. A thorough review of the record indicates that Schall was unable to travel in his car for any lengthy period of time and that he often could not come to work because of his pain and because of the

medication that he was taking to combat the pain. 29 C.F.R. § 1630.2(g)(1) (1999) defines "disability" as "a physical or mental impairment that substantially limits one or more of the major life activities of such individual." "Substantially limited" means "either the inability to perform a major life activity, or a severe restriction on the ability to perform a major life activity as compared to the general population." *Dutton*, 859 F. Supp. at 505 (citing 29 C.F.R. § 1630.2[j][i]). Schall argues that he is limited in the major life activity of "work." Work is considered a major life activity under the ADA. 29 C.F.R. § 1630.2(i). See also *Colwell v. Suffolk County Police Dept.*, 158 F.3d 635, 642 (2d Cir. 1998) (major life activity under the Rehabilitation Act [the model for the ADA] includes "work"). Schall has been substantially limited in the major life activity of "work." Schall is "disabled" as is defined under the ADA.

The district court dismissed the ADA claim because Schall is a not a "qualified" individual as is defined under the ADA.

29 C.F.R. § 1630.2(m) states that a "qualified individual with a disability" means

> "an individual with a disability who satisfies the requisite skills, experience, education and other job-related requirements of the employment position such individual holds or desires, and who, with or without reasonable accommodation, can perform the essential functions of such position."

The federal courts have adopted a two-step inquiry to analyze whether a plaintiff is "qualified" under the ADA:

> " 'First, we must determine whether the individual could perform the *essential functions* of the job, i.e., functions that bear more than a marginal relationship to the job at issue. Second, if (but only if) we conclude that the individual is not able to perform the essential functions of the job, we must determine whether any *reasonable accommodation* by the employer would enable him to perform those functions.' " (Emphasis added.) *Milton v. Scrivner, Inc.*, 53 F.3d 1118, 1123 (10th Cir. 1995) (quoting *White*, 45 F.3d at 360-61).

The term "essential functions" is defined as "the fundamental job duties of the employment position the individual with a disability holds or desires." 29 C.F.R. § 1630.2(n)(1). Whether a particular function is essential is a factual inquiry. 29 C.F.R. Pt. 1630, App. § 1630.2(n). The ADA provides that in making this inquiry, "consideration shall be given to the employer's judgment as to what

functions of a job are essential." 42 U.S.C. § 12111(8) (1994). Equal Employment Opportunity Commission regulations promulgated under the ADA provide:

"(2) A job function may be considered essential for any of several reasons, including but not limited to the following:

(i) The function may be essential because the reason the position exists is to perform that function;

(ii) The function may be essential because of the limited number of employees available among whom the performance of that job function can be distributed; and/or

(iii) The function may be highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function." 29 C.F.R. § 1630.2(n).

In the present case, Schall did not work more than a handful of days from the date of his surgery on October 16, 1996, until February 11, 1997. Several doctors were of the opinion that Schall could not work at all. On January 16, 1997, Drs. DuMont Schmidt and David Sollo concluded that Schall was unable to perform the work required of him by his job and that Schall could not drive as required by his job. Schall suffered from chronic pain and was taking strong medication to combat the pain. Schall could not make site visits to supervise the physicians assistant students and their preceptors. Schall has admitted that he cannot drive for more than 30 minutes at a time. An essential part of Schall's job was to visit the students on site and counsel them on their clinical rotations. WSU has students all over the state of Kansas, many in rural areas. Prior to his surgery, Schall would spend days on the road visiting sites and many times spend the night in motels. He was unable to do this after his surgery.

Travel was a fundamental part of Schall's job. Because he was unable to travel to the sites to visit with the students, the trial court did not err in holding that Schall could not perform the *essential function* of his clinical supervisor job. The first part of the "qualified individual" test, as described in *Milton*, has not been satisfied by Schall.

Pursuant to *Milton*, we must determine whether Schall could have performed the essential parts of his job with *reasonable accommodation*.

On February 10, 1997, Schall proposed that he be allowed to work part time. Schall argues that he should have been given part-time work and that part-time work is an example of "reasonable accommodation" citing 42 U.S.C. § 12111(9) and 29 C.F.R. § 1630.2(o)(2)(ii). A worker bears the burden to prove that he could perform the essential functions of the job with "reasonable accommodation." *Tyndall v. National Educ. Centers*, 31 F.3d 209, 213 (4th Cir. 1994); *Lucero v. Hart*, 915 F.2d 1367, 1371 (9th Cir. 1990).

Employers, however, do not have to give an employee a "reasonable accommodation" that would cause an "undue hardship." 42 U.S.C. § 12112(b)(5)(A) (1994); *Den Hartog v. Wasatch Academy*, 129 F.3d 1076, 1087 (10th Cir. 1997). "The employer . . . bears the burden of persuasion on whether a proposed accommodation would impose an undue hardship." *Smith v. Ameritech*, 129 F.3d 857, 866 (6th Cir. 1997). The factors to be considered in determining whether an accommodation would cause an employer undue hardship are, among others: the nature and cost of the accommodation; the number of persons employed by the company; the financial resources of the company; and the impact of the accommodation upon the operation of the company. 42 U.S.C. § 12111(10)(B).

The ADA does not require an employer to create a new position or even modify an essential function of an existing position in order to accommodate a disabled worker. *Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1169-70 (10th Cir. 1999). An employer is not required to reallocate job duties to change the essential functions of a job. 29 C.F.R. Pt. 1630, App. § 1630.2(o). An accommodation which results in other employees having to work longer hours or to work harder in the same time is not required. *Barnard v. ADM Milling Co., Inc.*, 987 F. Supp. 1337, 1343 (D. Kan. 1997). Schall's co-workers wrote a letter to Lary, stating:

"If the Clinical Supervisor is allowed to return to work on a part-time basis, we cannot see that anything will change. There are several urgent and ongoing matters that need constant attention including site visits, student evaluation and counseling, rotation scheduling, preceptor visits, senior handbook publication, preceptor manual publication, affiliation agreements, and other student matters that may

arise. Obviously, these tasks cannot be managed by someone who is here infrequently."

Other WSU faculty members attempted to cover the "on campus" clinical supervisor tasks, but they were unable to make the site visits that were an essential part of Schall's job. The faculty informed Lary that they were not able to "cover" for Schall. The faculty also stated that their own jobs would suffer unless the clinical supervisor position was filled with a person who could perform the job. The faculty believed that the student's education was at risk because the students were not being properly trained. The record establishes that the other faculty members were not able to perform their own jobs and the traveling portion of Schall's job as well. There is no reasonable accommodation that would have allowed Schall to perform the essential functions of his job. Schall is not able to satisfy the second element of the "qualified individual" test as described in *Milton* and is not a "qualified individual" within the meaning of the ADA.

Schall also argues that whether a plaintiff is able to perform the essential functions of a job is a factual inquiry and, therefore, summary judgment is inappropriate. There may be cases where the facts are at issue, therefore precluding summary judgment, but this case is not one of them. It is not disputed that Schall could not travel as a result of his chronic pain. It is not disputed that it would not have been reasonable to have other faculty members fill in for Schall's travel schedule without placing an undue hardship on the faculty and WSU. This argument is without merit.

### III. FMLA CLAIM

As to Schall's FMLA claim, we believe the reasoning in *Thomson v. Ohio State University Hosp.*, 5 F. Supp. 2d 574 (S.D. Ohio 1998), to be sound. It states in pertinent part:

"In enacting the FMLA, Congress, in addition to pursuing the general goal of promoting family cohesion, was attempting to prevent discrimination on the basis of gender. Congress noted that our society traditionally places the responsibility for familial care-giving on women and that this responsibility affects the working lives of women more than men. 29 U.S.C. § 2601(a)(5). Further, 'employment standards that apply to one gender only have serious potential for encouraging employers to discriminate against employees and applicants for employment who

are of that gender.' 29 U.S.C. § 2601(a)(6). Congress, by enacting the FMLA, sought to prevent employers from discriminating against women because of the responsibility for familial care imposed on them by society. Indeed, the stated effort to 'promote the goal of equal employment opportunity for women and men,' 29 U.S.C. § 2601(b)(5), evinces an intent to prevent retaliation or discrimination against an employee, who Congress has found to be female more often than not, who requests time off work to perform care-giving functions." 5 F. Supp. 2d at 579.

Pursuant to the FMLA, employees are entitled to a total of 12 weeks per calendar year of leave:

"(A) Because of the birth of a son or daughter of the employee and in order to care for such son or daughter.

"(B) Because of the placement of a son or daughter with the employee for adoption or foster care.

"(C) In order to care for the spouse, or a son, daughter, or parent, of the employee, if such spouse, son, daughter, or parent has a serious health condition.

"(D) Because of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1) (1994).

The FMLA provides these "entitlements" to an employee, which distinguish it from other acts, such as the ADA. The FMLA, therefore, fails the second prong of the *Katzenbach* test as it goes beyond the scope allowed by the Constitution. The court in *Thomson* held that the FMLA failed the second prong of *Katzenbach*, thereby preventing abrogation, and stated:

"In effect, Congress, inasfar as it purports to rely on the Fourteenth Amendment as the basis of the FMLA, is attempting to dictate that the Equal Protection Clause of the Fourteenth Amendment requires that employees be furnished twelve weeks of leave per year for the reasons set forth in the act. This is patently the sort of substantive legislation that exceeds the proper scope of Congress' authority under § 5 [of the Fourteenth Amendment]. As earlier noted, there must be a 'congruence and proportionality' between the injury to be prevented and the means adopted to that end. *City of Boerne*, 521 U.S. at 520, 117 S. Ct. at 2164. The means employed in the FMLA are not congruous or proportional to the goal of achieving equal treatment, regardless of gender, in the workplace. Of course, the Equal Protection Clause demands this of state employers. However, the FMLA does not merely make it illegal for employers to treat requests for leave differently on the basis of gender, but instead mandates that employers provide employees with a new and valuable benefit." 5 F. Supp. 2d at 579-80.

We agree with the court in *Thomson* and hold that the second prong of *Katzenbach* has not been met as the provisions of the FMLA are not congruent or proportionate to the discrimination to be remedied. See also *Kilvitis v. County of Luzerne*, 52 F. Supp. 2d 403, 410 (D. Pa. 1999) (finding that "Congress did more than attempt to enforce the Equal Protection Clause" but that it "created a statutory entitlement to 12 weeks of leave for eligible employees").

The *Thomson* court also noted that the FMLA raises some "concerns" when analyzing the third *Katzenbach* prong and stated:

"Similarly, the FMLA creates an entitlement to leave, the cost of which is to be borne by employers. If applicable to the states, the FMLA would impose a significant financial burden. It would be the state employer which would either have to absorb the cost of decreased productivity or expend its resources in an attempt to replace absent employees while they enjoy their leave benefits under the FMLA. Moreover, the FMLA would mandate that state employers provide a valuable benefit to their employees that is entirely foreign to the employment agreement reached between the individual and the state. This would be an inappropriate interference into a traditional area of state sovereignty which runs afoul of the spirit of the Constitution and the concepts of federalism which it contains." 5 F. Supp. 2d at 580-81.

Although the United States Supreme Court has not addressed this issue, the clear majority of courts have held that Congress failed to abrogate the states' Eleventh Amendment immunity when it enacted the FMLA, thereby preventing plaintiffs from bringing actions under the FMLA against the state in federal court. See *Garrett v. University of Alabama*, 193 F.3d 1214, 1220 (11th Cir. 1999) (affirming the district court and holding that the FMLA did not satisfy the second prong of *Katzenbach* as there is no connection between the remedy and the discrimination which was sought to be remedied); *Philbrick v. University of Connecticut*, 90 F. Supp. 2d 195, 199 (D. Conn. 2000) (noting that the majority of courts that have considered this issue have found that states have immunity from FMLA claims and holding that the FMLA does not satisfy the second prong of *Katzenbach*); *Cohen v. Nebraska Dept. Administrative Services*, 83 F. Supp. 2d 1042, 1046 (D. Neb. 2000) (holding that Congress did not act pursuant to a valid grant of power in enacting the FMLA, thereby allowing the state to assert

immunity pursuant to the Eleventh Amendment); *Darby v. Hinds County Dept. of Human Services*, 83 F. Supp. 2d 754, 760 (S.D. Miss. 1999) (holding that the FMLA establishes an entitlement and that Congress has no power to give substantive meaning to the Equal Protection Clause in this manner, thereby allowing the state to claim immunity pursuant to the Eleventh Amendment); *Kilvitis*, 52 F. Supp. 2d at 411 (agreeing with the majority of courts that have addressed this issue and holding that the Eleventh Amendment bars an action brought pursuant to the FMLA when the defendant is the state); *Sims v. University of Cincinnati*, 46 F. Supp. 2d 736, 740 (S.D. Ohio 1999) (holding that the FMLA failed the second and third prong of the *Katzenbach* test); *Driesse v. Florida Bd. of Regents*, 26 F. Supp. 2d 1328, 1334 (M.D. Fla. 1998) (holding that the FMLA did not abrogate Florida's immunity as it fails the second and third prong of the *Katzenbach* test); *McGregor v. Goord*, 18 F. Supp. 2d 204, 209 (N.D. N.Y. 1998) (holding that the FMLA was not "plainly adapted" to remedy sex discrimination, therefore allowing New York to assert Eleventh Amendment immunity as a defense to actions brought in federal court); *Thomson*, 5 F. Supp. 2d at 580 (holding that the states could use Eleventh Amendment immunity to defend FMLA cases as the FMLA did not pass the second prong of the *Katzenbach* test as there is no congruence and proportionality between the injury to be prevented and the means adapted to that end); and *Post v. State of Kansas*, 1998 WL 928677, *3 (D. Kan. 1998) (noting that the majority of courts "and all of the more recent cases have concluded that the Eleventh Amendment bars FMLA claims" against the states and holding the same). Pursuant to *Alden*, the same reasoning applies to FMLA actions brought in state courts.

Only three courts have held that Congress effectively abrogated the states' immunity when it enacted the FMLA. See *Jolliffe v. Mitchell*, 986 F. Supp. 339, 342-33 (W.D. Va. 1997) (holding that the language of the FMLA "could not be more clear" and that Congress abrogated the Eleventh Amendment immunity when it passed the act); *Biddlecome v. University of Texas*, 1997 WL 124220, *3 (S.D. Tx. 1997) (holding that the plaintiff's FMLA claim should not be dismissed as Congress had abrogated the State's

immunity when it enacted the FMLA); and *Knussman v. State of Md.*, 935 F. Supp. 659, 663 (D. Md. 1996) (holding that Congress intended to abrogate the state's rights under the Eleventh Amendment when it enacted the FMLA). All three decisions have been criticized for failing to apply a thorough analysis of the issue. See *Philbrick*, 90 F. Supp. 2d at 200 (criticizing *Knussman, Biddlecome,* and *Jolliffe* for failing to address the second and third prongs of *Katzenbach*); *Cohen*, 83 F. Supp. 2d at 1045 n. 2 (noting that *Jolliffe* failed to apply the "congruence and proportionality" test from *City of Boerne v. Flores*, 521 U.S. 507, and that *Knussman* only addressed the first prong of *Seminole Tribe*); *Darby*, 83 F. Supp. 2d at 759 n. 8 (noting that none of the decisions "conformed to the analysis dictated by *Flores*"); *Kilvitis*, 52 F. Supp. 2d at 410 (noting that *Biddlecome* and *Jolliffe* both failed to address whether Congress acted within the scope of its constitutional authority); *Driesse*, 26 F. Supp. 2d at 1334 (noting that the three decisions contain very little analysis and that both *Jolliffe* and *Biddlecome* failed to apply the *Katzenbach* test in reaching their decision); and *Thomson*, 5 F. Supp. 2d at 581 (refusing to recognize any of the three cases for their "inexplicable" failure to apply the *Katzenbach* test and noting that none of the cases "apply the analysis required by the United States Supreme Court").

We hold that Schall's FMLA claims are barred by sovereign immunity and that Congress failed to abrogate that immunity when it enacted the FMLA as the Act does not satisfy the second and third prongs of the *Katzenbach* test.

In any event, Schall was given oral notice of his right to 12 weeks' paid leave and received that sum. Under the circumstances, he is not entitled to 12 more weeks even though WSU failed to follow the statute and give him written notice.

## IV. BREACH OF CONTRACT CLAIM

WSU may not assert sovereign immunity on the breach of contract issue as WSU consented to suit when it entered into the employment agreement with Schall. WSU argues, however, that Schall should have appealed the decision to terminate him pursuant to the Kansas Judicial Review and Civil Enforcement of

Agency Actions Act (KJRA). Schall argues that the KJRA does not apply. The provisions of the KJRA only concern Schall's breach of contract issue and do not affect either the ADA or FMLA claims.

The district court ruled that it did not have subject matter jurisdiction over the case as the provisions of the KJRA had not been satisfied by Schall.

Because WSU is a state agency, WSU argues that Schall's only remedy was to appeal the final decision of President Hughes pursuant to the KJRA. See *Hurd v. Pittsburg State University*, 821 F. Supp. 1410, 1412 (D. Kan. 1993); *Garrity v. Board of Administration*, 99 Kan. 695, 698, 162 P. 1167 (1917). A petition for review must be filed within 30 days after an agency action. K.S.A. 77-613; see *Kansas Sunset Assocs. v. Kansas Dept. of Health & Environment*, 16 Kan. App. 2d 1, 3, 818 P.2d 797 (1991). Because Schall has never filed an appeal with a district court pursuant to the KJRA, WSU argues that Schall is time barred from bringing this action and, therefore, this court should affirm the dismissal of Schall's action.

The KJRA applies to "all agencies and all proceedings for judicial review and civil enforcement of agency actions not specifically exempted by statute from the provisions of this act." K.S.A. 77-603(a). In accordance with K.S.A. 77-603, the KJRA establishes the exclusive means of judicial review of agency action. The KJRA allows the district court to award monetary damages to the extent expressly allowed by law as well as any other appropriate relief, whether mandatory, injunctive, or declaratory; preliminary or final; temporary or permanent; equitable or legal. K.S.A. 77-622; see *Lindenman v. Umscheid*, 255 Kan. 610, 617, 875 P.2d 964 (1994).

The KJRA was Schall's only remedy for his breach of contract claim. See *Farmers Banshares of Abilene, Inc. v. Graves*, 250 Kan. 520, 523, 826 P.2d 1363 (1992); see also *Reifschneider v. Kansas State Lottery*, 266 Kan. 338, 340-41, 969 P.2d 875 (1998) (holding that plaintiffs could not bring separate action in contract when their sole remedy was through the KJRA); *Fowles v. Kansas State Lottery*, 254 Kan. 557, 565, 867 P.2d 357 (1994) (plaintiffs could not bring separate suit based on breach of contract where their sole remedy was through the KJRA); *Douglass v. Kansas State Univer-*

*sity*, 22 Kan. App. 2d 171, 174, 915 P.2d 782, *rev. denied* 259 Kan. 927 (1996) (teacher who was terminated from university could not bring separate breach of contract action where sole remedy lay in the KJRA). K.S.A. 77-613(b) requires petitions for judicial review to be filed within 30 days after the service of the final order. Failure to comply with the KJRA's jurisdictional requirement deprives a district court from jurisdiction to consider a contract claim. See *Kansas Sunset Assocs.*, 16 Kan. App. 2d at 3. Schall has never filed an appeal to a district court from the final order of President Hughes pursuant to the KJRA.

This court has no jurisdiction to consider Schall's contract claim.

Affirmed.