NOT DESIGNATED FOR PUBLICATION

No. 122,060

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STEPHEN D. GOLDMAN,
*Appellant*,

v.

THE UNIVERSITY OF KANSAS
and
JEFFREY P. KRISE,
*Appellees*.

MEMORANDUM OPINION

Appeal from Douglas District Court; JAMES R. MCCABRIA, judge. Opinion filed December 23, 2020. Affirmed.

*Theodore J. Lickteig*, of Lenexa, and *Frederick D. Deay II*, of Overland Park, for appellant.

*Derek T. Teeter* and *Michael T. Raupp*, of Husch Blackwell LLP, of Kansas City, Missouri, for appellees.

Before ARNOLD-BURGER, C.J., POWELL and GARDNER, JJ.

POWELL, J.: Stephen D. Goldman, a former graduate student in the School of Pharmacy at the University of Kansas, was found guilty of committing scholarly misconduct in 2010. As a result, the University placed a letter in his file for three years and dismissed him from the School of Pharmacy, but it did not expel him from the University. Goldman filed this lawsuit challenging the University's actions under the Kansas Judicial Review Act (KJRA), K.S.A. 77-601 et seq., as well as asserting tort and

1

statutory causes of action against the University and Dr. Jeffrey Krise, his advisor and the complainant in the scholarly misconduct action (collectively "Defendants"). In two separate rulings, the district court denied relief under the KJRA and granted summary judgment on his other claims in the Defendants' favor. Goldman now appeals, raising numerous points of error. After a thorough review of the record, and for reasons more fully explained below, we affirm the district court.

FACTUAL AND PROCEDURAL BACKGROUND

The facts from the agency hearing are derived from the district court's memorandum decision on Goldman's KJRA claims.

"Findings of Fact

"Stephen Goldman (petitioner) was a graduate student in the School of Pharmacy at the University of Kansas. Dr. Jeffrey Krise is a faculty member in the Pharmaceutical Chemistry Department in the School of Pharmacy, and acted as Mr. Goldman's advisor. Mr. Goldman had been working under the supervision of Dr. Krise for more than four years. The relevant facts of this case come into play when Mr. Goldman was in his final year of study. In May 2009, Dr. Krise requested that Mr. Goldman perform a series of experiments, with the intent to publish the results. Over the course of roughly seven months, Mr. Goldman met weekly with Dr. Krise and the other members of the lab to discuss lab results. Dr. Krise reported that Mr. Goldman presented information in the weekly lab meetings that seemed to confirm the group's initial hypothesis.

"In December 2009, in preparation for his manuscript outlining his lab's results, Dr. Krise asked Mr. Goldman to send him very specific data. Dr. Krise asked for all primary (i.e. raw) data with regard to each experiment Mr. Goldman had completed. The experiments fell into five separate categories. Two categories dealt with mouse cells, two others dealt with human cells, and the final category of experiments was separate and the court will call it the "siRNA" category. In response to his advisor's request, Mr. Goldman sent Dr. Krise by email the results from only the experiments done on mouse cells (i.e.

2

two categories of experiments). After receiving Mr. Goldman's email message, Dr. Krise met with him in person and explained he needed the data from the human cells and the SiRNA experiments as well. Mr. Goldman sent Dr. Krise a second email message containing an attachment that appeared to Dr. Krise to contain the human cell data. Dr. Krise based his belief that the data contained in the attachment was the human cell experiment data he requested on the labeling contained in the document. The belief was also bolstered by the fact that he specifically asked Goldman for that data in person a few days prior to receiving the email message.

"Dr. Krise looked through Mr. Goldman's lab notebook that was always present in the lab to confirm the results Mr. Goldman emailed. After evaluating Mr. Goldman's lab notebook, Dr. Krise believed that Mr. Goldman had made misrepresentations about the data at lab meetings for the previous seven months. Dr. Krise also believed that Mr. Goldman had sent fabricated or misleading data in the second email that was supposed to contain human cell data. In mid-January, Dr. Krise met with Mr. Goldman to discuss these issues and Mr. Goldman subsequently sent an apologetic email, the purpose of which is now in dispute. After receiving Mr. Goldman's apologetic email, Dr. Krise initiated scholarly misconduct allegations against Mr. Goldman. The University conducted an internal misconduct procedure after which it dismissed Mr. Goldman from the School of Pharmacy.

"Timeline of University Review Process

"Dr. Krise completed the School of Pharmacy Student Misconduct form on February 17, 2010. Next, the Dean of the School of Pharmacy sent a letter to Vice Chancellor of Research & Graduate Studies, Steve Warren, with copies to Mr. Goldman and Dr. Krise. Vice Chancellor Warren asked Dr. Robert Hanzlik to perform an Inquiry into the allegations, as required by Section 2 of Article IX of the University Senate Rules and Regulations (USRRs). After reviewing materials from the parties, including narrative statements and the lab notebook, and meeting with Mr. Goldman and Dr. Krise, Dr. Hanzlik reported his findings to Vice Chancellor Warren in a letter dated May 19th. Dr. Hanzlik recommended that a more thorough investigation be completed, subject to Section 3 of Article IX of the USRRs. Mr. Goldman received a copy of Dr. Hanzlik's Inquiry report on June 2nd. By July 9th the University had appointed an Investigative

3

Committee ("Committee") and notified Mr. Goldman and Dr. Krise of the composition of the Committee. The Committee was comprised of seven individuals, five of whom were voting members. Dr. Krise and Mr. Goldman each nominated three individuals, and one person from each of their lists was chosen to serve on the Committee. The Committee held its hearings in mid-October and issued a draft report on October 28th. Its final report was issued to Vice Chancellor Warren on December 21st. The Investigative Committee found that Mr. Goldman had committed scholarly misconduct and recommended that 1) a letter be placed in Mr. Goldman's file for three years, and 2) the School of Pharmacy and Department of Pharmaceutical Chemistry make every effort to work with Mr. Goldman to enable him to complete his Ph.D. research in a timely manner. The Committee noted several mitigating circumstances to explain their recommendation.

"Under the University rules, the Vice Chancellor finally determines the sanctions to be imposed for scholarly misconduct. U.S.R.R. 9.4.1. Vice Chancellor Warren issued his final determination December 22nd. In his report, Vice Chancellor Warren agreed that Mr. Goldman had committed scholarly misconduct, but chose to impose different sanctions than the Investigative Committee. The new sanctions included the letter in Mr. Goldman's file for three years, and Mr. Goldman's dismissal from the School of Pharmacy. Vice Chancellor Warren noted that Mr. Goldman was not expelled and could petition the School of Pharmacy to seek reinstatement, or admission into another department or school within the University. The Vice Chancellor's report represented a final agency action by the University. The sanctions were effective on January 7, 2011, after the Senate Executive Committee found no reason to amend the Vice Chancellor's ruling. Mr. Goldman appealed the Vice Chancellor's sanctions to the University Judicial Board, as permitted under USRR 9.4.7. The Judicial Board concluded that the sanction of dismissal was 'substantially disproportionate' to the severity of the misconduct identified. The Judicial Board issued its recommendation to the Chancellor, which more closely mirrored the Investigative Committee's recommended sanctions than they did the Vice Chancellor's sanctions. On June 1st, 2011, the Chancellor issued her decision accepting Vice Chancellor Warren's imposed sanctions."

On April 5, 2010, Goldman sought judicial review of the University's decision in the district court. Over a year later, on September 2, 2011, Goldman amended his petition

4

by adding tort and statutory claims against the University and Krise. In his amended petition, Goldman claimed: (1) The determination of scholarly misconduct was not supported by substantial evidence; (2) the determination was unreasonable, arbitrary, or capricious; (3) the Investigative Committee (Committee) failed to follow prescribed procedure; (4) one member of the Committee was biased against Goldman; (5) the University tortiously interfered with a prospective business relationship; (6) the University breached its contract with Goldman; and (7) Krise violated Goldman's constitutional right to due process.

On January 5, 2015, following many continuances, the district court issued a memorandum decision denying all of Goldman's KJRA claims. The district court found the Committee heard testimony and evidence and possessed substantial evidence to find Goldman committed scholarly misconduct. Although it questioned Vice Chancellor Steve Warren's reasons for increasing the sanctions over what the Committee had proposed, it noted the Vice Chancellor and Chancellor Bernadette Gray-Little made their decision within the proper legal standard, so the decision was not unreasonable, arbitrary, or capricious. The district court further found the University followed all its procedures and Goldman was aware of the allegations against him and was able to respond to them. Finally, the district court found there was no support for the claim that Thomas Prisinzano—a Committee member who had coauthored an unrelated academic paper with Krise—had an improper conflict of interest or bias against Goldman rendering the committee member unable to hear the complaint.

Goldman appealed the district court's decision, and another panel of our court dismissed the appeal for lack of jurisdiction, holding that Goldman's remaining tort and statutory claims for relief had not been decided yet. *Goldman v. University of Kansas*, 52 Kan. App. 2d 222, 231, 365 P.3d 435 (2015). A mandate was issued, and the case returned to the district court.

5

On February 14, 2019, before the district court, the Defendants sought summary judgment on Goldman's three remaining claims. The district court issued a written memorandum decision granting summary judgment in favor of the Defendants on all three claims. The district court found Goldman had not alleged malice on the part of the Chancellor, a necessary element for his tortious interference claim. With respect to the breach of contract claim, the district court found Goldman's employment was at will as a matter of law and, as such, there had been no breach of contract. Finally, the district court found Goldman was afforded due process; Goldman failed to support his argument about Prisinzano's bias with any legal authority; and Goldman was barred from bringing a claim under 42 U.S.C. § 1983 (2018) because the KJRA was the exclusive means of relief.

Goldman timely appeals both of the district court's rulings.

ANALYSIS

Before us, Goldman raises the same seven claims he raised before the district court. Goldman's seven issues are divisible into two groups. Goldman's first group of claims fall under the KJRA: (1) a lack of substantial evidence supports the University's decision that he engaged in scholarly misconduct; (2) the University's decision was unreasonable, arbitrary, or capricious; (3) the Committee did not follow proper procedures; and (4) the Committee was improperly constituted because it contained a member biased against him. Goldman's second group of claims fall outside the KJRA and are those in which the district court granted summary judgment in favor of the University: (1) tortious interference; (2) breach of contract; and (3) a violation of his right to due process and an impartial investigating committee under 42 U.S.C. § 1983.

6

I.    DID THE DISTRICT COURT ERR BY FINDING THE UNIVERSITY DID NOT VIOLATE THE KANSAS JUDICIAL REVIEW ACT?

*Standard of Review*

Our review begins with the presumption that the University's action was valid. We "exercise the same statutorily limited review of the agency action as does the trial court, *i.e.*, as though the appeal had been made directly to the appellate court." *Romkes v. University of Kansas*, 49 Kan. App. 2d 871, 880, 317 P.3d 124 (2014). The KJRA is the exclusive means of judicial review of an agency's action. K.S.A. 77-606. The KJRA applies to all agencies and all proceedings for judicial review except for those specifically exempted. K.S.A. 77-603(a). But the KJRA "creates only procedural rights and imposes only procedural duties." K.S.A. 77-603(b). The party asserting the invalidity of the agency action bears the burden to prove such action was invalid. K.S.A. 77-621(a)(1).

*Analysis*

The KJRA provides eight grounds on which an agency's action may be invalidated. K.S.A. 77-621(c). Goldman invokes four, namely: (1) substantial evidence does not support the University's action—K.S.A. 77-621(c)(7); (2) the University's action was unreasonable, arbitrary, or capricious—K.S.A. 77-621(c)(8); (3) the University engaged in unlawful procedure or failed to follow prescribed procedure—K.S.A. 77-621(c)(5); and (4) the Committee was improperly constituted—K.S.A. 77-621(c)(6).

A.    *Did substantial evidence support the University's determination that Goldman committed scholarly misconduct?*

Goldman first asserts substantial evidence does not support the University's determination that he committed scholarly misconduct. Goldman alleges his own

testimony and his attorney's cross-examination of Krise undermined Krise's testimony and the evidence against him. Goldman also claims the district court erred when it found the Committee members possessed the background to understand the scientific concepts in the case. Goldman argues the district court essentially rubber-stamped the Committee's findings because it found the Committee qualified and gave it an inappropriate level of deference.

The Defendants respond that Krise's testimony documented the specific ways Goldman fabricated, manipulated, and concealed data. They also argue Goldman ignores Krise's direct testimony, relying instead on particular lines of cross-examination plucked out of context and from Goldman's own testimony. The Defendants also dispute Goldman's characterization of the district court's description of the Committee.

A court must grant relief under the KJRA if the agency action was based on evidence that was not substantial "when viewed in light of the record as a whole." K.S.A. 77-621(c)(7).

> "'[I]n light of the record as a whole' means that the adequacy of the evidence in the record before the court to support a particular finding of fact shall be judged in light of all the relevant evidence in the record cited by any party that detracts from such finding as well as all of the relevant evidence in the record, compiled pursuant to K.S.A. 77-620, and amendments thereto, cited by any party that support such finding, including any determinations of veracity by the presiding officer who personally observed the demeanor of the witness and the agency's explanation of why the relevant evidence in the record supports its material findings of fact. In reviewing the evidence in light of the record as a whole, the court shall not reweigh the evidence or engage in de novo review." K.S.A. 77-621(d).

"'Substantial evidence is such legal and relevant evidence as a reasonable person might accept as sufficient to support a conclusion.'" *Geer v. Eby*, 309 Kan. 182, 190, 432

P.3d 1001 (2019); see also *Kotnour v. City of Overland Park*, 43 Kan. App. 2d 833, 837, 233 P.3d 299 (2010) ("Although [K.S.A. 77-621] does not define the term 'substantial evidence,' case law has long stated that it is such evidence as a reasonable person might accept as being sufficient to support a conclusion."). K.S.A. 77-621(d) requires us to (1) review the evidence both supporting and detracting from the agency's findings; (2) examine the presiding officer's credibility determinations, if any; and (3) review the agency's explanation as to why the evidence supports its findings. *Bd. of Cherokee County Comm'rs v. Kansas Racing & Gaming Comm'n*, 306 Kan. 298, 327, 393 P.3d 601 (2017); *Redd v. Kansas Truck Center*, 291 Kan. 176, 182, 239 P.3d 66 (2010). Even if there is evidence supporting the agency's decision, we must consider "'whether the evidence supporting the agency's decision has been so undermined by cross-examination or other evidence that it is insufficient to support the agency's conclusion.' *Herrera-Gallegos v. H & H Delivery Service, Inc.*, 42 Kan. App. 2d 360, 363, 212 P.3d 239 (2009)." *Romkes*, 49 Kan. App. 2d at 889.

The Committee found Goldman committed scholarly misconduct in that "(1) there was a significant departure from accepted practices of the relevant scholarly community; (2) the misconduct was committed intentionally, knowingly, or recklessly; and (3) the allegation was proven by a preponderance of the evidence." The Committee based its decision "on a belief that data presented by [Goldman] to [Krise] was altered including misrepresentation of standard error bars, mislabeling of graphs, and concealing data that did not support the hypothesis."

Goldman takes issue with each of the Committee's reasons and argues substantial evidence does not support the findings. The Defendants complain Goldman cherry picks the evidence by only presenting parts of his testimony and Krise's cross-examination and ask us to reweigh the evidence and make credibility determinations. The Defendants are partially right. Goldman frequently measures Krise's testimony against his own testimony or his lawyer's cross-examination of Krise and argues his evidence is more credible than

9

Krise's. We are not permitted to reweigh evidence or engage in de novo review. K.S.A. 77-621(d). However, Goldman also uses this evidence for an appropriate purpose—showing he presented evidence to the Committee that detracts from the Committee's finding of scholarly misconduct.

The Defendants try to argue that Goldman's arguments are irrelevant because Goldman sent an email to Krise before Krise filed the scholarly misconduct complaint. In his email, Goldman stated:

> "[T]here is no excuse for what I did. I didn't make up data but let bad data pass as good data, which is equally if not more terrible. I think I did it because I was insecure about why some cells were working and others were not when I thought that the Lobel lab could get it to work. Also I was egotistical and should have let you know."

Significantly, the Committee did not indicate that it relied on this email as an admission of scholarly misconduct. So, instead, we will focus on the three actions the Committee stated it relied on in finding scholarly misconduct.

### 1.    *Standard Error Bars*

The Committee found Goldman misrepresented the standard error bars. Krise presented bar graphs showing a 20-fold (statistically significant) difference between the manipulated data sent to him by Goldman and the actual data found in Goldman's lab notebook.

Goldman argues cross-examination undermined Krise's testimony because it showed Krise did not include these graphs in the original complaint, and Krise admitted he could not tell whether the raw data for the bar graphs showed statistically significant data. But Goldman cherry picks from the cross-examination, focusing on whether this

10

information was included in the complaint, not the veracity of the data. Whether the information was included in the original complaint is not relevant to whether substantial evidence supported the Committee's finding. And, while Krise did say he could not tell if that data was statistically significant without doing a statistical analysis on the data, Krise also testified that, based on the data, the graph should be 20-fold elevated.

Additionally, the complaint and Krise's testimony focused on the many ways Goldman misrepresented data. The data should have shown no difference between the normal NPC1 deficient cells and the NPC2 deficient cells; instead, the data Goldman sent Krise showed the NPC1 deficient cells had a much higher IC50. Krise showed the Committee several graphs highlighting the difference in the data between what Goldman presented to Krise and the data in Goldman's lab notebook. Goldman did not attack the veracity of the evidence, only its importance or meaning. A reasonable person could agree the graphs showing the difference in the real and manipulated data was enough to support the scholarly misconduct finding.

### 2. *Mislabeling of Graphs*

Next, the Committee found Goldman mislabeled the graphs he sent to Krise as human cell data instead of mouse cell data. Goldman argues Krise made a mistaken conclusion about the graphs because Goldman had been on vacation. To support his argument, Goldman cites to his response to the complaint that the MEF label on the graphs was cropped out because Krise was trying to persuade his audience that a mistake was made. Goldman also takes issue with Krise's presentation of the nomenclature used on the graph for identifying mouse cell and human cell data. Based on his response to the complaint, Goldman argues Krise was wrong about the labels used for mouse cells and human cells.

First, the extensive discussion in Krise's original complaint of Goldman mislabeling of the graphs refutes his written response. Second, despite Goldman's claim that Krise could not explain how the legend can refer to both mouse cells and human cells, Krise did so multiple times. Goldman does not point to any evidence besides his response to the complaint. A reasonable person could find Krise's explanation of the mislabeled graphs sufficient to support a finding of scholarly misconduct.

### 3.     *Concealing Data*

Third, the Committee found Goldman concealed data that did not support the experiment's hypothesis. Goldman gives several explanations for why he did not actually conceal any data, including that he did show Krise the data, testimony from other students indicating the presentations were summaries of the data not primary data, and Krise did not explain how the absence of a PowerPoint slide was evidence that Goldman concealed data.

Goldman's explanations do not contradict Krise's testimony about concealing data but seek to show alternative reasons for why the data was not presented to Krise. Although the Committee did not explicitly make a credibility finding, by finding Goldman concealed data, it implicitly found Goldman was not credible. Again, we are not permitted to reweigh the evidence or determine witness credibility. K.S.A. 77-621(d). Additionally, Krise presented the data in Goldman's lab notebook and compared that data to the data Goldman submitted to Krise. The Committee had the source evidence to evaluate and determined Goldman concealed data. A reasonable person could find the evidence supported the finding.

Finally, at the end of his substantial evidence argument, Goldman tacks on a criticism of the district court for stating the Committee had the background to understand the scientific concepts in this case. Goldman notes the district court only describes two of

12

the five voting members and seven total members of the Committee as having experience in the physical sciences. He claims: "One might have understood the District Court simply adopting the findings of the Investigating Committee." It is not clear to us how this assertion is relevant to whether substantial evidence supported the Committee's findings. Our review of the district court's memorandum decision indicates that it took the time to read the arguments and the extensive agency record in reaching its decision. The district court's decision is well reasoned and clearly not a blind adoption of the findings of the Committee.

A reasonable person could find the evidence sufficient to support the Committee's finding of scholarly misconduct.

B. *Was the University's determination that Goldman committed scholarly misconduct unreasonable, arbitrary, or capricious?*

Next, Goldman argues the Committee's finding that he committed scholarly misconduct was unreasonable, arbitrary, or capricious. Goldman relies on his substantial evidence arguments and asserts the University's explanation was counter to the evidence. The Defendants respond the decision should be affirmed for the same reasons that substantial evidence supports the Committee's findings.

A reviewing court shall grant relief if the agency action was unreasonable, arbitrary, or capricious. K.S.A. 77-621(c)(8). When an agency possesses discretion, as the Committee and the University did here, "a court must presume the validity of an agency action and cannot substitute its judgment for that of the administrative agency unless the action is unlawful, unreasonable, arbitrary, or capricious." *Lario Oil & Gas Co. v. Kansas Corporation Comm'n*, 57 Kan. App. 2d 184, 205, 450 P.3d 353 (2019). "'An agency's action is "arbitrary and capricious" if it is unreasonable or "without foundation in fact."'

13

[Citations omitted.]" *Chesbro v. Board of Douglas County Comm'rs*, 39 Kan. App. 2d 954, 970, 186 P.3d 829 (2008).

> "[A]n action is unreasonable when it is taken without regard to the benefit or harm to all interested parties or is without foundation in fact, and that an action is arbitrary and capricious if it is unreasonable or lacks any factual basis. Essentially, the test under K.S.A. 77-621(c)(8) determines the reasonableness of the agency's exercise of discretion in reaching its decision based upon the agency's factual findings and the applicable law. . . . [F]actors that may be considered include whether: (1) the agency relied on factors that the legislature had not intended it to consider; (2) the agency entirely failed to consider an important aspect of the problem; (3) the agency's explanation of its action runs counter to the evidence before it; and (4) whether the agency's explanation is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. Courts must be careful in making this review because the legislature has given the discretion to make the decision to an agency, not the court. [Citations omitted.]" *Wheatland Electric Cooperative v. Polansky*, 46 Kan. App. 2d 746, 757-58, 265 P.3d 1194 (2011).

Goldman argues *Wheatland*'s third factor—the Committee's explanation was counter to the evidence—most clearly favors him. Goldman does not discuss the application of the other factors and relies on his substantial evidence argument to assert the scholarly misconduct finding was unreasonable, arbitrary, or capricious.

But substantial evidence does support the Committee's finding of scholarly misconduct, so Goldman cannot show why the Committee's decision was unreasonable, arbitrary, or capricious on this basis. Goldman appears to complain the Committee compressed its findings into a two-page letter, but he does not point to any authority showing the decision's length is evidence the decision was unreasonable, arbitrary, or capricious. The Committee's decision letter adequately explained its reasons supporting its scholarly misconduct finding.

14

Goldman also points out the district court criticized the University's rationale for imposing more serious sanctions than the Committee recommended, but it stopped short of calling the decision unreasonable, arbitrary, or capricious. Goldman claims the district court rightfully showed the University's decision on sanctions to be improper but failed to take the next step and find the action unreasonable, arbitrary, or capricious.

Goldman misinterprets the district court's decision. The district court did question Warren's and Gray-Little's imposition of more stringent sanctions, and a reasonable person could agree with such criticism. It is fair to ask why the University has multiple review and appellate procedures if the University can then ignore them at will. In fact, the district court noted in its memorandum decision that the University's review and appellate procedures appeared to be "mere window dressing."

But we do not overturn an agency's decision when we dislike the result. As the district court noted, when a discretionary decision is made that takes the proper factors into account and is within appropriate legal parameters, the decision "'is protected even if not wise.'" *Dragon v. Vanguard Industries, Inc.*, 277 Kan. 776, 779, 89 P.3d 908 (2004). University policy vests the Chancellor with the sole discretion to determine sanctions. Gray-Little's letter showed she considered the Committee's recommendation, as well as the recommendations from Warren and the Judicial Board panel. Gray-Little articulated a reasonable basis for adopting the sanction recommendation from Warren.

Goldman has failed to persuade us that the scholarly misconduct finding was unreasonable, arbitrary, or capricious.

C. *Did the University fail to follow its own procedures and applicable federal rules*?

Next, Goldman argues the University did not follow its own procedures in the investigation or hearing nor did it comply with federal regulations. Goldman asserts the University admitted it did not contact the federal Office of Research Integrity (ORI) as federal regulations require. Goldman argues the University's initial inquiry did not find a reasonable basis that research misconduct occurred, as required by University rules and federal regulations. Goldman also asserts the Defendants did not give him proper notice of all the allegations. Finally, Goldman states the district court erred in giving the University deference over its interpretation of its own rules and procedures. He also complains about the district court's failure to address each material fact at issue.

The Defendants respond that Goldman's list of material facts is irrelevant because the district court was not required to address individually each material fact in its ruling. The Defendants argue the University correctly followed its procedures throughout this case.

When an agency has engaged in unlawful procedure or failed to follow its prescribed procedures, a court must grant relief. K.S.A. 77-621(c)(5).

Goldman first complains of 17 "material issues of fact" on which the district court did not rule. Goldman bases this argument on K.S.A. 77-621(b), which states: "The court shall make a separate and distinct ruling on each material issue on which the court's decision is based." While it is true that the statute requires a ruling on each issue, the statute does not require a district court to address each fact raised to support each issue or each fact that may be in dispute. The district court addressed the issues in its ruling and grouped Goldman's allegations into five categories before proceeding to explain why any

16

procedural error was harmless, if any errors occurred at all, because any alleged procedural errors did not harm Goldman.

For example, Goldman argues the University did not provide him with a complete list of allegations and claims Krise added new allegations at the hearing, in violation of 42 C.F.R. § 93.309(a) (2019). Goldman does not explain what allegations the University failed to notify him of in writing within a reasonable time. Instead, Goldman's brief states the record references those allegations and then cites to the Defendants' surreply brief in opposition to Goldman's petition for judicial review. That part of the surreply is the Defendants' explanation contradicting Goldman's assertion about his lack of notice. It does not explain what allegations Goldman failed to get reasonable notice of, nor does it explain how Goldman was prejudiced. It is Goldman's duty to provide adequate support for his argument, and his failure to do so results in the argument being waived. See *In re Adoption of T.M.M.H.*, 307 Kan. 902, 912, 416 P.3d 999 (2018).

Goldman also argues the University's inquiry did not conclude there was a reasonable basis to find that research misconduct occurred, as required by federal regulations and the University's procedures. In his reply to the Defendants' arguments, Goldman adds the University's rule allows the outcomes from an inquiry to be (1) no basis for an investigation or (2) a more thorough investigation is necessary, which Goldman believes violates federal regulations.

Federal regulation 42 C.F.R. § 93.307(d)(1) (2019) states:

"An inquiry's purpose is to decide if an allegation warrants an investigation. An investigation is warranted if there is—

"(1) A reasonable basis for concluding that the allegation falls within the definition of research misconduct . . . ."

17

University Senate Rules and Regulations (U.S.R.R.) procedure requires the person conducting the inquiry to notify the Vice Chancellor if a more thorough investigation is necessary. U.S.R.R. 9.2.6(b). From the text of the regulation and University rules, U.S.R.R. 9.2.6(b) does not violate the relevant federal regulation. Nothing in the regulation prevents a university from deciding a more thorough investigation is necessary to determine if research misconduct did occur. Moreover, even if 42 C.F.R. § 93.307(d)(1) and U.S.R.R. 9.2.6(b) do conflict, Hanzlik's letter explained a reasonable basis existed for an investigation, even if he did not use the magic words. Hanzlik found Goldman's changing of the labeling on a data set "suspicious" and "strange," found Goldman's explanations weak, and recommended a more thorough inquiry because he believed there was evidence to support the possibility of research misconduct.

Goldman next argues the University erred because it did not contact the ORI as required by 42 C.F.R. § 93.309(a) and U.S.R.R. 9.1.4 and 9.4.6. The University admitted to the district court that it did not contact the ORI, although it stated an official consulted with the ORI and was told it was not necessary. More importantly, Goldman does not explain how this failure harmed him.

Without specifically finding that errors occurred, the district court found any error to be harmless. The KJRA requires taking into account harmless error. K.S.A. 77-621(e). Given that Goldman asserts his procedural rights provided by federal regulations and university rules were violated, a nonconstitutional harmless error test applies requiring us to determine if there was a reasonable probability the error affected the hearing's outcome. See *State v. McCullough*, 293 Kan. 970, 981, 270 P.3d 1142 (2012).

The district court was correct in finding any error was harmless. The only potential error we see is that the University failed to formally notify ORI of the investigation. But that failure had no effect on Goldman's inquiry and hearing. Any other error that may have occurred was also harmless. Goldman was able to respond to Krise's complaint. The

18

alleged new allegations were, in fact, just more detailed explanations of the allegations in the complaint. Goldman was not prejudiced by any errors the University made.

Parenthetically, we note that Goldman takes issue with the district court's reliance on *Tonge v. Werholtz*, 279 Kan. 481, 109 P.3d 1140 (2005), and *Schmidt v. Kansas Bd. of Technical Professions*, 271 Kan. 206, 21 P.3d 542 (2001). Both cases explain courts should give deference to an agency's interpretations of its own rules and regulations. See *Tonge*, 279 Kan. at 484; *Schmidt*, 271 Kan. at 214. Goldman also asserts that *In re Tax Appeal of LaFarge Midwest*, 293 Kan. 1039, 271 P.3d 732 (2012), overrules both cases. But *Lafarge* addressed an agency's interpretation of statutes, not its own regulations. 293 Kan. at 1044. The district court's citation to *Tonge* and *Schmidt* related to its finding that the University correctly followed its own procedures rather than the School of Pharmacy's student handbook. Goldman does not challenge that decision here.

Any failure of the University to follow its rules or federal regulations was harmless.

D.      *Was the University's Committee improperly constituted because one member had a conflict of interest*?

For his final KJRA claim, Goldman alleges the Committee was improperly constituted because committee member Prisinzano had a conflict of interest for coauthoring a paper with Krise. See K.S.A. 77-621(c)(6). Goldman also asserts the district court erred in finding Goldman waived the argument by not objecting to Prisinzano's inclusion on the Committee. The Defendants reply that Goldman cites no evidence to support his assertion there was a conflict of interest and that coauthoring an unrelated paper does not create a conflict of interest. The Defendants also assert Goldman waived the argument because he never objected during the administrative process. In his reply brief, Goldman argues he could not object within the timeframe given by the Vice

Chancellor because the paper was not published at that time. Goldman does not reply to the merits of the Defendants' argument.

As to the point that Goldman waived the issue by not objecting below, the district court did not explicitly find Goldman waived his conflict of interest argument. The district court noted at the end of its finding that Goldman never objected to Prisinzano's participation and if Goldman was concerned about his neutrality, then an objection would have been appropriate. Goldman argues he could not object because he did not learn of Krise's and Prisinzano's coauthorship until after the deadline the Vice Chancellor gave the parties to object. While true, Goldman had ample time after the paper was published and before his hearing to voice his objection. He did not do so until after the Judicial Board heard his appeal. But even if Goldman had not waived his objection to Prisinzano's participation on the Committee, there was no conflict.

Goldman principally alleges a conflict of interest existed because Krise and Prisinzano had a joint financial interest due to the expenditure of funds to prepare their paper. However, Goldman does not provide a citation to the record to support his claim that a joint financial interest existed or even that Krise and Prisinzano spent research funds in coauthoring their paper. Goldman also notes U.S.R.R. 9.3.2 and 42 C.F.R. § 93.310(f) (2019) require members of an investigating committee to have no unresolved financial conflicts of interest. But Goldman does not explain how there is an unresolved conflict of interest. Moreover, even if coauthoring a paper causes a conflict of interest, the article was published before the hearing, likely ending the conflict.

In light of a lack of caselaw suggesting coauthoring an unrelated paper creates a conflict of interest, the district court was correct to observe: "Surely it is assumed that faculty in their professional capacities can collaborate on research and also review administrative matters neutrally and fairly." There is no evidence in the record to suggest

20

Prisinzano was unable to participate in the scholarly misconduct investigation in a fair and unbiased manner or that the Committee was improperly constituted.

II.     DID THE DISTRICT COURT ERR IN GRANTING SUMMARY JUDGMENT?

*Standard of Review*

> "'Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. On appeal, we apply the same rules and when we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied.' [Citation omitted.]" *Patterson v. Cowley County, Kansas*, 307 Kan. 616, 621, 413 P.3d 432 (2018).

When considering summary judgment, a court must refrain from weighing the evidence or passing on witness credibility. *Esquivel v. Watters*, 286 Kan. 292, 295-96, 183 P.3d 847 (2008). "If the moving party shows the absence of facts to support an essential element of the nonmoving party's claim, that nonmoving party "'has the affirmative duty to come forward with facts to support its claim, although it is not required to prove its case."' [Citations omitted.]" *Drouhard-Nordhus v. Rosenquist*, 301 Kan. 618, 623, 345 P.3d 281 (2015). Summary judgment should be denied if a genuine issue of material fact exists. *Siruta v. Siruta*, 301 Kan. 757, 766, 348 P.3d 549 (2015). Direct evidence is not required to survive summary judgment; circumstantial evidence may be considered. 301 Kan. at 768. But speculation is "insufficient to avoid summary judgment." *Chesbro*, 39 Kan. App. 2d at 960.

21

*Analysis*

    A.    *Did the district court properly grant summary judgment on Goldman's tortious interference claim because he made no showing of malice*?

Goldman argues the district court erred in granting summary judgment to Defendants on his tortious interference claim. Specifically, Goldman argues the district court erred when it found Goldman had failed to produce any evidence of malice. The Defendants respond that Goldman did not provide any evidence that Gray-Little, the ultimate decisionmaker, acted with malice, any evidence of a business expectancy, and that any assertion of future employment was mere speculation.

The elements of tortious interference with a prospective business advantage or relationship are:

> "(1) the existence of a business relationship or expectancy with the probability of future economic benefit to the plaintiff; (2) knowledge of the relationship or expectancy by the defendant; (3) that, except for the conduct of the defendant, plaintiff was reasonably certain to have continued the relationship or realized the expectancy; (4) intentional misconduct by defendant; and (5) damages suffered by plaintiff as a direct or proximate cause of defendant's misconduct.

> "[The intentional misconduct prong is] predicated on malicious conduct by the defendant." *Turner v. Halliburton Co.*, 240 Kan. 1, 12, 722 P.2d 1106 (1986).

Malice is "'a state of mind characterized by an intent to do a harmful act without a reasonable justification or excuse.' PIK Civ. 3d 103.05." *Dunn v. First Nat. Bank of Olathe*, No. 92,543, 2005 WL 1277949, at *3 (Kan. App. 2005) (unpublished opinion); see also *Turner*, 240 Kan. at 8 (defining "actual malice" as "'actual evil-mindedness or specific intent to injure'").

Generally, the question of malice is a jury question. *Burcham v. Unison Bancorp, Inc.*, 276 Kan. 393, 425, 77 P.3d 130 (2003); see *Turner*, 240 Kan. at 8, 11-12 (discussing defamation action but holding same reasoning applied to tortious interference claim). But if the plaintiff fails to offer any evidence of "'an extrinsic character'" to prove malice on the part of the defendant, there is no issue for the jury, and it is the district court's duty to determine the issue. 240 Kan. at 8.

Here, the district court granted summary judgment to the Defendants based on its finding that Goldman did not allege any facts to show malice to support the intentional misconduct element. Although Goldman provides a list of eight facts he alleges support malice, the problem is that none of them involve the decisionmaker. Here, the ultimate decisionmaker was Chancellor Gray-Little. Gray-Little had the discretion to accept the Committee's scholarly misconduct finding, and she made the final decision concerning the sanctions against Goldman. Goldman's tortious interference claim does not allege malice on the part of Gray-Little, so Goldman cannot show intentional misconduct by the University in finding him guilty of scholarly misconduct and dismissing him from the School of Pharmacy.

Perhaps recognizing this, Goldman argues Gray-Little's decisions were rubber stamps for those who did show malice against Goldman. Goldman argues that, under the cat's paw theory of liability, the district court should have imputed to Gray-Little the malicious actions of her subordinates. The term "cat's paw" derives from a fable from Aesop, put into verse by La Fontaine in 1679, and injected by Judge Posner in 1990 into employment discrimination law. See *Shager v. Upjohn Co.*, 913 F.2d 398, 405 (7th Cir. 1990). In the fable, a monkey uses flattery to induce a cat to retrieve chestnuts from the fire. After the cat does so, the monkey makes off with the chestnuts, leaving the cat with nothing but burnt paws. *Staub v. Proctor Hospital*, 562 U.S. 411, 415 n.1, 131 S. Ct. 1186, 179 L. Ed. 2d 144 (2011).

The cat's paw theory has been used in Title VII employment discrimination cases. See *Menaker v. Hofstra University*, 935 F.3d 20, 37 (2d Cir. 2019). A traditional Title VII case utilizes a burden-shifting framework where the plaintiff must establish a prima facie case of discrimination; then the burden shifts to the employer to provide a legitimate, nondiscriminatory reason for the adverse employment action; before the burden shifts back to the plaintiff to submit admissible evidence from which a finder of fact could infer the employment decision was more likely than not based in whole or in part on discrimination. A cat's paw case is a slight variation of a Title VII vicarious liability case. 935 F.3d at 30.

> "In a 'cat's paw' case, . . . the agent 'manipulates an employer into acting as a mere conduit for his [discriminatory] intent.' . . . [S]o long as the agent intended and was the proximate cause of the adverse result, the agent's discriminatory intent may be imputed to the employer under traditional agency principles. . . . [This occurs] where the employer . . . knew or should have known of the agent's discriminatory motivation." 935 F.3d at 37-38.

As the Defendants note, the use of the cat's paw theory is inappropriate here. First, Goldman fails to show that the cat's paw theory has ever been applied outside of Title VII cases, and we see a good reason for that. Title VII only requires proof that discrimination was a motivating factor, while an intentional tort—like tortious interference—requires proof a defendant intended an action to occur. Second, Kansas courts have never applied the cat's paw theory in employment discrimination or otherwise. We reject the use of the cat's paw theory here.

Without any facts alleging malice on the part of Gray-Little, Goldman fails to allege a genuine dispute of any material facts. The district court correctly found Goldman did not establish the intentional misconduct element of his intentional misconduct claim.

24

B.      *Did the district court properly grant summary judgment on Goldman's breach-of-contract claim because he was an at-will employee*?

Next, Goldman argues the district court erred in granting the University summary judgment on his breach-of-contract claim. He asserts that whether he had an employment contract with the University and whether that contract specified his employment was at will were factual questions for a jury to decide. Goldman alleges a document entitled "Graduate Research Assistant (GRA) Intent to Appoint" contains ample indicia for a jury to conclude the document was a written contract. He also claims the district court should have applied a duty of good faith and fair dealing to the contract. In reply, the University argues Goldman's claim is precluded because the KJRA is the exclusive means by which Kansas state employees can challenge the termination of their contractual employment. Alternatively, the University asserts the plain language of the GRA Intent to Appoint states the document is not a formal offer of employment and any employment was to be at will.

The University relies on *Schall v. Wichita State University*, 269 Kan. 456, 482, 7 P.3d 1144 (2000), for the proposition that the KJRA is Goldman's only remedy for his breach-of-contract claim. See *Fowles v. Kansas State Lottery*, 254 Kan. 557, 565, 867 P.2d 357 (1994) (holding same in action against Kansas Lottery based on judicial review of agency action under KJRA). The University also raised this argument before the district court, but the district court chose not to address this issue, instead granting summary judgment to the University on the merits. While we are inclined to agree with the University's argument the KJRA is the only avenue for relief for an employment contract claim, we need not answer the question because Goldman's breach-of-contract claim fails on the merits.

"In order to form a binding contract, there must be a meeting of the minds on all essential elements." *Albers v. Nelson*, 248 Kan. 575, 580, 809 P.2d 1194 (1991).

25

Generally, the existence of a contract depends on the parties' intent and is a question of fact for the jury. But where the legally relevant facts are undisputed, the existence and terms of a contract become legal questions for the court's determination. Our review of such legal questions is de novo. *U.S.D. No. 446 v. Sandoval*, 295 Kan. 278, 282, 286 P.3d 542 (2012). "'The primary rule for interpreting written contracts is to ascertain the parties' intent. If the terms of the contract are clear, the intent of the parties is to be determined from the language of the contract without applying rules of construction. [Citations omitted.]'" *Peterson v. Ferrell*, 302 Kan. 99, 104, 349 P.3d 1269 (2015).

The GRA Intent to Appoint states any employment for the GRA position "would be 'at will.'" The employment-at-will doctrine generally holds that "employees and employers may terminate an employment relationship at any time for any reason, unless there is an express or implied contract governing the terms of employment." *Peters v. Deseret Cattle Feeders, LLC*, 309 Kan. 462, 469, 437 P.3d 976 (2019). An employer may terminate an "'at-will employee' for good cause, for no cause, or even for a wrong cause, without incurring liability to the employee for wrongful discharge." *Morriss v. Coleman Co., Inc.*, 241 Kan. 501, 508, 738 P.2d 841 (1987).

Goldman acknowledges the language of the GRA Intent to Appoint but claims it created an implied contract between the University and him beyond merely employment at will. It is true that parties may become contractually obligated by their conduct as well as by their oral or written words, and implied contracts arise from the facts and circumstances showing a mutual intent to contract. See *Quaney v. Tobyne*, 236 Kan. 201, Syl. ¶ 3, 689 P.2d 844 (1984) (terms of contract may be proven by parties' acts and attending circumstances). "Because the intent must be mutual, an implied contract cannot be established solely by the employee's subjective understanding or expectation of his or her employment." *Peters*, 309 Kan. at 470. Intent is a state of mind, and courts should be cautious in granting summary judgment "'when resolution of the dispositive issue

26

necessitates a determination of the state of mind of one or both of the parties.'" 309 Kan. at 470-71.

However, the only fact or evidence Goldman offers to show the existence of an implied contract beyond employment at will is the GRA Intent to Appoint. But this document instead defeats any claim that Goldman had a written employment contract with the University or that his employment was beyond employment at will.

Goldman argues the document has ample indicia for a jury to find it is a contract because it includes a durational element, a statement of purpose, and a rate of compensation. But the durational element contains a start date and no end date; the statement of purpose describes the position; and it is not surprising a document describing a paid position includes the pay rate. More significant is the fact that the GRA Intent to Appoint explicitly stated it was "not a formal offer of employment and does not guarantee . . . employment." The GRA Intent to Appoint cannot serve as the basis for an employment contract when it expressly states it is only an offer of employment. Instead, the GRA Intent to Appoint provides a description of the GRA position if Goldman accepts that position. Also, the GRA Intent to Appoint expressly states that any employment "would be 'at will' and may be terminated at any time." Goldman signed the GRA Intent to Appoint on the line immediately below that explanation. Despite Goldman's assertions to the contrary, the GRA Intent to Appoint does not form a written contract nor does it create an implied contract beyond employment at will.

Recognizing the obstacle of the at-will language in the document and relying on *Wilkinson v. Shoney's, Inc.*, 269 Kan. 194, 215-16, 4 P.3d 1149 (2000), and *Stover v. Superior Industries Int'l, Inc.*, 29 Kan. App. 2d 235, 240-41, 29 P.3d 967 (2000), Goldman argues that a determination of whether employment is at will is also a fact question for a jury. While Goldman is generally correct, we have stated that when the material facts are not in dispute, a court may determine whether a contract exists. See

*Sandoval*, 295 Kan. at 282. Additionally, the cases Goldman relies on are distinguishable. The document at issue in *Wilkinson* was a poster, and in *Stover*, an employee handbook. In both cases, the courts noted there was no evidence the employee was aware of the policy and other facts disputed those policies. See *Wilkinson*, 269 Kan. at 215-16; *Stover*, 29 Kan. App. 2d at 240-41. Here, Goldman signed the GRA Intent to Appoint, showing his awareness of its contents. Goldman also offered no evidence beyond that document to prove an understanding to the contrary.

Finally, Goldman argues the district court erred in not applying a duty of good faith and fair dealing to his employment contract. But a duty of good faith and fair dealing does not apply to employment-at-will contracts. *Morriss*, 241 Kan. at 518. Goldman acknowledges the state of the law but asks us to overrule *Morriss*. We are duty bound to follow Kansas Supreme Court precedent absent an indication the Supreme Court is departing from its position. See *State v. Rodriguez*, 305 Kan. 1139, 1144, 390 P.3d 903 (2017). As the Kansas Supreme Court has given no such indication, we cannot overrule *Morriss*.

There was no breach of contract.

C.       *Did the district court err in granting summary judgment on Goldman's 42 U.S.C. § 1983 claim?*

For his final claim, Goldman asserts the district court erred when it granted summary judgment on his 42 U.S.C. § 1983 claim. Goldman brought his § 1983 claim only against Krise; he did not name the University. Goldman argues Krise violated his constitutional right to due process under the Fifth and Fourteenth Amendments to the United States Constitution and placed a biased individual on the Committee.

28

Krise responds in several ways. First, he argues Goldman could only bring his due process claim under the KJRA, not 42 U.S.C. § 1983. Second, Krise argues only the University had the duty to provide Goldman with due process, not him. But if he somehow had some due process duty to Goldman, Krise argues he provided adequate notice to Goldman and that Prisinzano was an impartial decisionmaker. Third, Krise argues he is entitled to qualified immunity.

A person may file suit when a state official, acting under the color of law, deprives that person of "any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. To state a valid claim under § 1983, a plaintiff must allege: "(1) whether the conduct complained of was committed by a person acting under color of state law, and (2) whether this conduct deprived a person of rights, privileges, or immunities secured by the Constitution or federal law." *Purvis v. Williams*, 276 Kan. 182, 198, 73 P.3d 740 (2003).

Goldman alleges Krise deprived him of his right to procedural due process. Procedural due process requirements apply to deprivation of interests under the Fourteenth Amendment's protection of liberty and property. *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 569-70, 92 S. Ct. 2701, 33 L. Ed. 2d 548 (1972). "An essential principle of due process is that a deprivation of life, liberty, or property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.'" *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 542, 105 S. Ct. 1487, 84 L. Ed. 2d 494 (1985). "'[T]he root requirement' of the Due Process Clause" is that an individual receive an opportunity for a hearing to present reasons why the proposed deprivation should not happen before being deprived of significant property. 470 U.S. at 542. To show a due process claim, an individual must establish three prerequisites: (1) the official acted under the color of state law; (2) a due process interest existed; and (3) the alleged loss of that interest amounted to a deprivation of due process. See *Parratt v. Taylor*, 451 U.S. 527, 536-37, 101 S. Ct. 1908, 68 L. Ed. 2d 420 (1981), *overruled on*

29

*other grounds by Daniels v. Williams*, 474 U.S. 327, 106 S. Ct. 662, 88 L. Ed. 2d 662 (1986).

To survive summary judgment on his § 1983 claim, Goldman had to prove two elements: (1) Krise was acting under the color of state law and (2) Krise's conduct deprived Goldman of rights, privileges, or immunities under the U.S. Constitution or federal law. See *Parratt*, 451 U.S. at 535; *Purvis*, 276 Kan. at 198. To determine if Goldman was deprived of property in violation of the Due Process Clause, our task is to determine (1) whether Goldman had a protected interest in the property and was deprived of the property and (2) the extent of the process due. *State v. Wilkinson*, 269 Kan. 603, 608-09, 9 P.3d 1 (2000).

Goldman has alleged, and Krise does not dispute, that Goldman had a protected property interest in his continued education. Therefore, the remaining question is the extent of the process due to Goldman.

### 1. *KJRA is the only vehicle to raise due process violations.*

Before we can reach the merits of Goldman's due process claims, we must first address Krise's argument that we cannot reach the merits of Goldman's § 1983 claim because the KJRA provides meaningful postdeprivation review. The district court found *Hudson v. Palmer*, 468 U.S. 517, 104 S. Ct. 3194, 82 L. Ed. 2d 393 (1984), as well as its application in *Hartwick v. Board of Trustees of Johnson County Community College*, 782 F. Supp. 1507 (D. Kan. 1992), supported this position and found because a remedy could be granted under the KJRA, no due process claim under § 1983 could survive.

In *Hudson* and *Parratt*, the United States Supreme Court held that random, unauthorized deprivations of property do not violate due process if adequate postdeprivation remedies are available. See *Hudson*, 468 U.S. at 536; *Parratt*, 451 U.S. at

30

544. *Hudson* held intentional deprivations do not violate the Due Process Clause when predeprivation procedures are "'impracticable'" and adequate postdeprivation remedies are available, recognizing "[t]he state can no more anticipate and control in advance the random and unauthorized intentional conduct of its employees." 468 U.S. at 533.

Here, the district court relied on *Hartwick*'s extensive discussion and application of *Hudson*. In *Hartwick*, the Board of Trustees of Johnson County Community College did not renew Hartwick's contract because it alleged Hartwick had misappropriated college property. The Board held a due process hearing; Hartwick was represented by counsel who called witnesses on his behalf and introduced evidence to the hearing panel. The federal district court found Hartwick had a constitutionally protected property interest in his continued employment as a professor at the college. 782 F. Supp. at 1511. Hartwick filed a § 1983 action, complaining the Board did not base its ultimate decision on misappropriation, meaning he lacked proper notice, and alleging the hearing panel was biased.

In *Hartwick*, the federal district court explained that whether *Parratt* and *Hudson* precluded Hartwick's § 1983 claim depended on whether the Board could have implemented predeprivation safeguards to address the risk of deprivations of the kind alleged by Hartwick. 782 F. Supp. at 1513. The federal district court found Hartwick could not bring an action under § 1983 because the Kansas Teacher Tenure Act, K.S.A. 72-5410 et seq. (now K.S.A. 72-2215 et seq.) allowed nonrenewed teachers to appeal the hearing panel's decision to a state district court, constituting an adequate postdeprivation remedy for "random and unauthorized violations" of the Kansas Teacher Tenure Act. 782 F. Supp. at 1514-15.

Goldman argues *Hartwick* is distinguishable because he did not complain that the University provided him with an incomplete description of the allegations; rather, he did not receive notice of all the allegations. Goldman cites to several cases he argues better

explain the *Parratt-Hudson* doctrine:  *Snyder v. City of Topeka*, 884 F. Supp. 1504 (D. Kan. 1995); *Anglemyer v. Hamilton County Hospital*, 848 F. Supp 938 (D. Kan. 1994); and *Mason v. Board of Education, Unified School Dist. No. 209*, 741 F. Supp. 879 (D. Kan. 1990). However, these cases are distinguishable because they are employment termination cases where the state provided no process whatsoever prior to termination and the federal court found the state could have provided a predeprivation hearing. See *Snyder*, 884 F. Supp. at 1512-13 (finding city could not use regulations to terminate employee with no predeprivation process whatsoever); *Anglemyer*, 848 F. Supp. at 940 (finding in cases of termination of employment, it is possible to hold predeprivation hearing and due process requires predeprivation hearing, in addition to postdeprivation measures); *Mason*, 741 F. Supp. at 882 (finding state was in position to provide predeprivation process since it was required to under Teachers' Due Process Act; postdeprivation remedies under state law were not adequate to protect plaintiff's property interest).

To support the district court's finding, Krise cites an unpublished Second Circuit Court of Appeals case where the plaintiff was expelled from medical school. In *Attallah v. New York College of Osteopathic Medicine*, 643 Fed. Appx. 7 (2d Cir. 2016) (unpublished opinion), the plaintiff argued he was not obligated to pursue his claims under New York law, described as an Article 78 proceeding, because his expulsion was not academically based. The Second Circuit explained:

"The argument misapprehends the district court's decision, which did not hold that Attallah was *required* to challenge his expulsion in an Article 78 proceeding. Rather, the district court concluded that Attallah could not plausibly claim the deprivation of a protected interest without due process of law because an adequate post-deprivation remedy in the form of an Article 78 proceeding was *available* under state law. See *Attallah v. N.Y. Coll. Of Osteopathic Med.*, 94 F. Supp. 3d at 454-58. That ruling comports with controlling precedent. See *Hudson v. Palmer*, 468 U.S. 517, 533, 104 S. Ct. 3194, 82 L. Ed. 2d 393 (1984) (holding that alleged state deprivation of property does

32

not violate procedural due process 'if a meaningful postdeprivation remedy for the loss is available'). Thus, even if, as Attallah alleges, state employees acted in concert with administrators at [Attallah's] private medical school to expel him, any ensuing deprivation of property or liberty does not give rise to a procedural due process claim under § 1983." 643 Fed. Appx. at 9-10.

Here, the University provided Goldman with a predeprivation hearing before finding him guilty of scholarly misconduct and removing him from the School of Pharmacy. Goldman now complains his due process rights were violated for the University's failure to follow the required procedures in the investigation and hearing. In this manner, Goldman's argument is more like *Hartwick* than any of the cases Goldman provides.

Applying *Hartwick*, we find Goldman was provided with a predeprivation hearing. Assuming, without deciding, that Goldman's due process rights were violated at the hearing, it is impracticable for the State of Kansas to anticipate an actor would disregard the University's procedural rules. A hearing to remedy this violation during the midst of the scholarly conduct hearing would not be possible. It is not an action considered by Kansas law or University rules. Indeed, a person might not even realize his or her due process rights were violated until the hearing was over. But Kansas law does offer a postdeprivation remedy. Goldman could, and did, file a KJRA claim in state district court. The KJRA explicitly directs the district court to grant relief if the agency did not respect an individual's due process rights. K.S.A. 77-621(c)(5). Goldman's remedy for any due process violations is the KJRA and not a § 1983 claim.

2. *What due process did Krise owe Goldman?*

In our view it is significant that Goldman filed his § 1983 action against Krise only, not the University. As a result, to survive summary judgment, Goldman must show

a genuine issue of material fact supports his assertion that Krise violated his due process rights.

Goldman alleges he was not adequately informed of the accusations against him and he was deprived of an impartial panel. Krise claims Goldman never articulated a due process violation attributable to Krise individually. Krise argues it was the duty of the University and its officials conducting the investigation and hearing to follow its procedures and provide Goldman with due process. Goldman claims to be confused by this argument because a state and its agencies are not "persons" within the meaning of § 1983. Goldman is correct. See *Will v. Michigan Department of State Police*, 491 U.S. 58, 64, 109 S. Ct. 2304, 105 L. Ed. 2d 45 (1989). But Goldman misses Krise's point. Section 1983 requires Goldman to make allegations against a person, but the person or persons must be those who deprived Goldman of his constitutional rights. Krise argues it was not his duty to provide Goldman with due process and, therefore, he did not deprive Goldman of his constitutional rights to notice and an impartial panel. We agree.

The plain wording of 42 U.S.C. § 1983 contains a causation element:  "Every person who . . . *subjects, or causes to be subjected*, any citizen . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws . . . shall be liable to the party injured." In other words, a defendant is not liable under § 1983 unless he or she subjected a person to the deprivation or caused a person to be subjected to the deprivation.

Assuming for the moment Goldman's allegations of deprivation are true, Krise was not the person responsible for the deprivation. First, Krise was not responsible for creating an impartial Committee. Krise did not choose the Committee members. Both Krise and Goldman submitted the names of three persons to be on the Committee. Then Vice Chancellor Warren chose one name from each list to be a part of the seven-member committee (five members could vote, including Krise's and Goldman's members). It was

34

the Vice Chancellor, not Krise, who ultimately determined the composition of the Committee. Krise did not cause Goldman to be deprived of an impartial Committee.

Krise was the complainant. University rules require the complainant to report any scholarly misconduct to the Vice Chancellor for Research and Graduate Studies. U.S.R.R. 9.2.1. The Vice Chancellor then assigns an individual to undertake an inquiry. U.S.R.R. 9.2.1. But first, that individual must inform the respondent—here, Goldman—of the nature of the complaint. U.S.R.R. 9.2.3. The individual undertaking the inquiry must also take "all reasonable and practical steps" to gather all relevant records and evidence. U.S.R.R. 9.2.3. If an investigation is warranted, the Vice Chancellor must notify both parties and request their views. U.S.R.R. 9.3.1. When the respondent is not a professor, University rules require a similarly situated person be selected as a nonvoting member to make sure the respondent's rights are not violated. U.S.R.R. 9.3.3. During the investigation, it is the Committee's duty to pursue all significant issues and leads that are relevant to the investigation, including evidence of additional instances of possible scholarly misconduct. U.S.R.R. 9.3.4.

Goldman complains Krise did not provide him with notice of all the allegations of scholarly misconduct against him. But the University's rules show it was the job of the Vice Chancellor and the individual performing the inquiry to inform Goldman of the nature of the charges. And the Committee had a duty to pursue any issues that showed possible scholarly misconduct. Krise occupied none of those positions. Goldman's § 1983 claims must fail because Krise did not cause any deprivation of Goldman's right to due process. Given our findings we need not address Krise's claims of qualified immunity.

III.   CONCLUSION

In summary, we affirm the district court's judgment on the KJRA claims because we find the University's action was supported by substantial evidence and was not

35

otherwise unreasonable, arbitrary, or capricious. The University also provided appropriate process to Goldman. We also affirm the district court's grant of summary judgment in favor of the Defendants on Goldman's claims of tortious interference, breach of contract, and denial of due process.

Affirmed.